**Defendants Exhibit # 1**

1    IN THE 15TH JUDICIAL CIRCUIT CIURT IN AND FOR PALM BEACH COUNTY FLORIDA

2    CASE# 50-2019DP0000789/JL  & CASE # 50-2022DP000587/JL

3

4    Randal A. Ferguson/FATHER

5    IN THE INTREST OF HIS MINOR CHILDREN:

6

7

8    • HOWEVER, REGARDLESS OF THE STAY THE FATHER STATED THAT TO MOVE IN

9       A MOTEL TEMPORARY IN ANOTHER CITY WOULD CREATE AN EVEN BIGGER

10      BARRIER DUE TO THE FACT THAT THE FATHER RELIES ON THE BUS SYSTEM, THE

11      FATHER JOB IS IN WEST PALM BEACH SO IS HIS CHILDREN DAY CARE AND THE

12      FACT THAT HIS SON IS STARTING HIS FIRST DAY OF SCHOOL IN 1 DAY.  THE

13      FATHER WOULD  HAVE TO DO EVERYTHING ALL OVER AGAIN . 30 DAY

14      MAXIMUN STAY  AT A MOTEL IN A ANOTHER CITY IS TOO MUCH TO ASK ON

15      THE SPUR OF THE MOMENT WHERE THE FATHER HAS BUILD AND SATABALIZED

16      EVERYTHING IN WEST PALM BEACH.IN ADITION,THE FATHER WAS NOT

17      FAMILIAR WITH LAKE WORTH AND THAT MOVED WOULD BE TOO MUCH OF A

18      BARRIER AND CHALLENGE. THE FATHER RECEIVED A TEXT OD AN ULTIMATUM

19      FROM NICOLE SLADE AND ADVISED ABBY HARTMEN THAT IF THE FATHER DOES

20      NOT TAKE THE TEMPORARY SHELTER THAT THEY WOULD NEED TO CHECK OUT

21      OF THE  HOME 2 SUITES MOTEL PAYED FOR BY CHILDNET  IN THE MORNING

22      AND THAT SHE WOULD FILE PAPER WORK TO HAVE HAVE HIS CHILDREN

23      REMOVED FROM HIS CARE BECAUSE THE FAMILY WOULD BE HOMELESS , SO

24      SHE ASSUMED. THE FATHER BRIEFLY AND FINALLY GOT IN TOUCH WITH HIS

25      ATTORNEY TO SEE IT THERE WERE OTHER RESOURCES HE COULD REACH OUT

26      TO FOR  ANY  ASSISTANCE WITH HOUSING. THE ATTORNEY TOLD THE FATHER

27      THAT HE DOES NOT TAKE THIS TEMPORARY SHELTER THAT THEY WERE GOING

28      TO TAKE HIS CHILDREN BECAUSE THEY HAD NO PLACE TO LIVE ASLO ASSUMED

29      BY THE ATORNRY.  THE FATHER TURNED DOWN THE SHELTER OFFER AND

NEED TO WOORRY ABOUT HIM

30    STARTED WALKING OVER TO FAMILY PROMISE  WITH HIS CHILDREN TO

31    EXPLAIN WHY IT WAS NECESSARY  DUE TO THE FACT THAT THE MOVE TO

32    ANOTHER CITY AT THE SPUR OF THE MOMENT IS TOO MUCH OF A CHALLENGE

33    AS THEY WANTED THE FATHER TO  MOVE IMMEDIATELY [END Q **SETTLED**

34    **LAW:**

35    • According to recent 11th Circuit Court of Appeals decisions, even if a

36    defendant's removal to federal court was deemed erroneous, the circuit

37    court can still be found to have violated the removal process by continuing

38    with proceedings before the case was officially remanded back to the

39    lower court, essentially "proceeding forward" despite the pending appeal

40    on the removal issue; this is often seen in situations where a "later-served

41    defendant" attempts to remove a case without proper consent from all

42    other defendants already served, creating a potential procedural error that

43    the court must address before further proceedings.

44    • if a state court proceeds with a case after removal without a

45    remand order from the federal court, the state court's actions are

46    void. This is because 28 U.S.C. § 1446(d) states that a state court

47    must not proceed further with a case after removal unless and

48    until it is remanded.

49    • Rule 1.540 of the Florida Rules of Civil Procedure provides that the

50    court may relieve a party from a final judgment for enumerated reasons

51    such as mistake, inadvertence, surprise or excusable neglect; newly

52    discovered evidence; **fraud, misrepresentation, or other misconduct of**

53    **an adverse party; that the judgment if void; or that the judgment has**

54    **been satisfied, released, or discharged.  Fla. R. Civ. P.**

55    **1.540(b).  Because the trial court is accorded broad discretion in**

56    **determining Rule**

57

58

59                                    **1.**

60                                 **PRELUDE**

61    **PG 9 CONTINUES EITH   FURTHER STATED COMPLAINT**

62

NEED TO WOORRY ABOUT HIM

4

85                . WHETHER THE ATTORNRY OBLIGATION IS  THE JUDGE OR

86                TO OBLIGED BY THE FLORIDA RULES OF PROFESSSIONAL

87                CONDUCT I GUESS IS A MATTER OF CHOICE.

88       **In Florida, all lawyers are required to follow the Florida Bar Rules of**

89 **Professional Conduct (FRPC). The FRPC are a set of ethical guidelines that**

90 **establish the minimum standards of conduct for lawyers in Florida. Lawyers**

91 **who violate the FRPC can be subject to disciplinary action by the Florida Bar.**

92 **The FRPC are located in Chapter 4 of the Rules Regulating the Florida Bar. The**

93 **rules include both mandatory and permissive obligations. Some examples of the**

94 **FRPC include:**

95• **Candor, diligence, and respect: Lawyers owe these to the judiciary.**

96• **Professional integrity: Lawyers owe this to the administration of justice.**

97• **Courtesy and cooperation:** Lawyers should be courteous and cooperative with other

98 professionals.

99• **Reporting misconduct: Lawyers must report other lawyers' misconduct if they**

100 **have actual knowledge of it.**

101 **The Florida Bar investigates complaints of unprofessional conduct against its**

102 **members.**

103       HOWEVER AFTER BEING ADVISED AND PROPERLY NOTIFIED ON DEC 6TH ,

104 AS PROPELY FILING TO THE CLERK OF COURT 15TH JUDICAL CIRCUIT

NEED TO WOORRY ABOUT HIM

63               **NOTICE OF FILING INTO EVIDENCE THIS ADDENDUM TO THE COMPLAINT TO**

64    **THE FLORIDDA BAR OUTLINING THE ATTORNRY VIOLATION OF THE FLORIDA CODE OF**

65    **PROFESSIONAL CONDUCT FOR ATTORNY'S . THIS FILING IS  IN SUPPORT OF THE FATHER'S**

66    **MOTION TO DISMISS THE CIRCUIT COURT CASE W/PERJUDICE AND DISQUALIFICATION OF**

67    **SENIOR JUDGE MURPHY AND  SUCESSOR JUDGE KATHLEEN KROLL LISTING  BUT NOT LIMITED**

68    **OR EXLUSIVE ONLY TO THESE VILATIONS BUT SEVERAL OTHER LISTED MIS CARRIAGES OF**

69    **JUSTICE AND ABUSE OF DISCRETION BY THESE JUDGES AND DISQUALIFIED JUDGE KIRK**

70    **VOLKER  THAT CAUSED THE FATHER AND HIS MINOR  CHILDREN TO BE DEPRIVED OF THEIR**

71    **FEDERLLY PROTECTED RIGHTS  AND  LIBERTIES OF THE U.S.CONSTITUTION. BUT ADDITITONAL**

72    **ALREADY LISTED ISSUES FILED ALREADY WHICH ALSO INCLUDES IN VIOLATION OF FEDERAL**

73    **LAW,** 28 U.S.C. § 1446(d)

74        • THE FATHER MAKES THIS ONLY ONE NOTE OF EXCEPTION ON

75           BEHALF ON THE DCF ATTORNEY JOSHUA SMITH OF THE FACT

76           WHILE  DURING COURT HEARING PRIOR TO JUDGE KATHLEEN

77           KROLL FORCES THE FATHER INTO A TPR TRIAL DENYING THE

78           FATHER OF  RIGHT TO COUNSEL, DCF ATTORNRY SMITH DID

79           ATTEMPT TO APPEALTO THE JUDGE  CITING CASE  OF  THE FACT

80           THAT I WAS NOT REFUSING COUNSEL BUT RATHER REQUESTING,

81           COUNSEL .

82           THE ATTORNEY WAS REPRIMANDED BY JUDGE KROLL AND

83           ORDERED THAT HE BETTER BE PREPARED AND READY TO

84           PROCEDD FOURTH IN TRIAL ON THE 16TH OF  DEC 2024

NEED TO WOORRY ABOUT HIM

105  THAT THE ABOVE STYLE REMOVAL TO THE CLERK,  AGAIN AS WELL AS JUDGE

106  MURPHY ON DEC 11TH ,OF THE THE REMOVAL OF THE CASE,

107          ON DEC 16TH 2O24 AGAINST SEVERAL  OBJECTIONS  AND ORAL

108          ARGUMENTS TO **JUDGE  MURPHY** AND TO DCF **ATTORNEY JOSHUA**

109          **SMITH** ,(**GAL ATTORNRY) KEVIN WALSH**) AND **ROUGE ATTORNRY**

110          UNLAFULLY REPRESENTING MY MINOR CHILDREN **JORGE ANTON**  TO

111          DISMISS THE PROCEDDINGS OF HIS STATE CIRCUIT COURT.  WHEREAS

112          ALL 3 ATTORNY'S ACTING IN CONCERT WITH ONE ANOTHR, AND THE

113          JUDGE PROCEDDED ANYWAY,  THEY  IGNORED  AND CONTINUED  THE

114          PROCEDDINGS WHERE THE FATHER BECAME PHYSICALLY ILL DUE TO THE

115          EMOTIONAL DISTRESS OF BEING DEPRIVED OF HIS  FEDERALLY

116.         PROTECTED RIGHTS OF DUE PROCESS BEING FORCED IN TO  A  TPR TRIAL

117          WIHTOUT NOTICE OR CONSIDERATION THE CASE AT THE TIME WAS STILL

118          IN FEDERAL COURT  WHERE  THE STATE COURT T DID NOT EVEN  HAVE

119          JURISDICTION  OR LEGAL STANDING TO DO SO PRIOR TO THE REMOVAL,

120          BUUT EVEB MORE DID NOT HAVE ANY JURISDICTION AFTER THE

121          REMOVAL  WHILE THE CASE WAS STILL  NOT YET REMANDED BY TO THE

122          STATE COURT  SENIOR JUDGE MURPHY AND THE ATTORNRY'S

123          CONNTINUE TO PROCED FORWARD WITH THE TRIAL DENYING THE

124          FATHER REQUEST. THE FATHER WAS TAKEN TO THE HOSPITAL

125          ADDMITTED , TREATED AND RELASED ON THE EVENING OF THE 17TH WITH

126          INSTRUCTIONS AND DOCTORS NOTE UNTIL RESUMING REGULAR

NEED TO WOORRY ABOUT HIM

127         ACTIVITY ON DEC 21ST WHERE 6 TYPES OF MEDICATON PRESRIBE TO THE

128         FATHER.

129         **An attorney could potentially violate a defendant's 14th Amendment right**

130    **to due process if they proceed forward with a trial when a case has not yet been**

131    **remanded back to state court, essentially depriving the defendant of a fair legal**

132    **process as guaranteed by the Constitution; this is considered a procedural due**

133    **process violation.**

134    **Key points to understand:**

135    **The 14th Amendment states that no state shall "deprive any person of life,**

136    **liberty, or property, without due process of law.".**

137    **Procedural due process:**

138    **This aspect of due process focuses on whether the legal procedures followed in a**

139    **case were fair and proper.**

140    **How an attorney could violate due process in this scenario:**

141    **If a case is currently under appeal or awaiting a decision on remand to state**

142    **court, proceeding with a trial in the wrong jurisdiction could be considered a**

143    **violation of due process.**

144

NEED TO WOORRY ABOUT HIM

145    If the defendant is not adequately informed about the status of the case and the

146    potential implications of proceeding without remand, it could constitute a due

147    process violation.

148 Prejudice to the defendant:

149    Proceeding with the trial without remand significantly disadvantages the

150    defendant's ability to defend themselves, it could be seen as a violation of due

151    process.

152

153                                    **2.**

154                    **ADDENDUM TO COMPLAINT TO FLORIDA BAR**

155

156    THIS BAR NEEDS TO BEAR IN MIND IN THEIR INVESTIGATIONS INTO THE ACTIONS OF

157    THESE ATTORNEY'S  IN THIS COMPLAINT AND THE FACT THAT THE SCRUTINY ,

158    INVESTIGATION  AND DISECTING OF THE FALSE SHELTER AFFIDAVIT HAVE BEEN

159    INTENTIONALLY  AVOIDED, IGNORGED AND EXCLUDED FROM LITGATION AND RECOGNIZED

160    AS THE ROOT OF THIS ENTIRE LITGATION. AS THE 4TH DCA IN ITS UNCONSTITITUINAL

161    CAMPAGIN AND IN CONSPIRACY WITH THE LOWER COURT JUDGES AND ACTORS IN A

162    VIGIILANT EFFORT TO CONCEAL, HIDE AND BURY THE TRUTH OF THE POISENED SHELTER

163    AFFDAVIT WHICH IS THE ROOT OF THE WHOLE MATTER  OF THIS  CASE WERE THE CIRCUIT

164    COURT  HAVE BEEN PROCEDDING WITHOUT ANY LEGAL STANDING OR JURISDICTION

165    ESTABLISH BY THE ATTORNY'S OR THE  JUDGES IN THIS  LOWER CIRCUIT  THAT HAS CAUSED

166    MY CHILDREN TO BE UNLAWFULLY SEIZED,  VIOLATED OF THEIR RIGHT TO SUBSTANTIVE AND

NEED TO WOORRY ABOUT HIM

167  PROCEDURAL DUE PROCESS OF THE U.S CONSTITUTION. PHYSICALLY AND MENTALLY

168  ABUSED, DEPRIVED OF THEIR FAMILY INTEGREITY , THEIR FATHER, THEIR PRIVACY,  BEING

169  FORCED TO ASSIMILATE  ETC.. ETC..

170          THE FATHER BEING  UNLAWFULLY DEPERIVEED  OF HIS CHILDREN. UNLAWFULLY

171  DEPRIVED OF VISITON OF HIS CHILDREN   HIS FEDERSLLY PROTECTED RIGHTS AS A PARENT;

172  HIS RIGHT TO DEVELOP HIS FAMILY, HIS RIGHT AS THE PRIMARY DECISION MAKER , HIS RIGHT

173  TO PRIVACY , HIS  OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS ETC.. ETC..  THE FALSE

174  SHELTER AFFIDAVIT AND THE EFFORT TO HIDE , CONCEAL AND AVOID THE

175  TRUTH OF THE DELBERATE FALESHOODS CONATINED THIERIN HAVE CAUSED

176  JUDGES TO BE DISQUALIFIED , JUDGES TO COMMIT " DELBERATE MISREPRESENTAIONS, I.E.

177  "FRUAD ON THE COURTS',  ATTTORNRY'S TO VIOLATED THE RIGHTS OF MYSELF AND MY

178  CHILDREN THE ATTORNRYS VIOLATING FEDERAL AND STATE LAWS AGAINST  MYSELF AND MY

179  CHILDREN., MY CHILDREN  AS I ATTEMTED OBTAIN REVIEW & REDRESS OF THE

180  CONTIUTIONAL  VIOLATIONS , LACK OF LEAGL STANDING  , ERRORS OF RULINGS ,  UNFAIR

181  COURT PROCEDURES, MISCARRIGAES OF JUSTRICE AND JUDICAL MISCONDUCT BY

182  DISQAULIFIED JUDGE KIRK VOLKER AND ATTORNEY DENISE WEHIS FROM THE 4TH DCA,

183  APPELLATE JUDGE  WEISSENBAUM  IN  HIS BIAS AND PREJUDICE OF ME AS A PRO SE LITGANT

184  AND BLCK MAN ENGAGED IN A FRIVILOUS CAMPAGIN  OSTRASIZING ME AND MY LEGAL

185  REDRESS AS FRIVILOUS  FILINGS IN  CONPIRACY WITH LOWER CIRCUIT JUDGES KATHLEEN

186  KROLL AND KIRK VOLKER  TO NNOT ONLY UNLAWFULLY TERMINATE MY PARENTAL RIGHTS

187  WITHOUT CAUSE,  TO THE POINT WHERE THE PARTICIPATING  JUDGES IN THIS CASE OF THE

NEED TO WOORRY ABOUT HIM

188  4TH DCA  AND THE 4TH DCA  COURT ITSELF  HAVE VIOLATED MY 14TH AMENDMENT RIGHT TO

189  PROCEDURAL AND SUBSTANTIATIVE DUE PROCESS IN THEIR CONSPIRACY AND SUPPORT OF

190  THE CIRCUIT COURT JUDGES AND THEIR DEPRIVATIONS OF MY FEDRALLY PROTECTED RIGHTS

191  IN THEIR FAILNG  TO ESTABLISH A PRIMA FACIA CASE  DUE TO THEIR MISCARRIGAES OF

192  JUSTICE OF   "FRAUD ON THE COURTS"  OF A POSIEND SHELTER AFFIDAVIT SUBMITTED  BY

193  CPI INVESTIGATOR  (BRIA ASKINS) IN CONCERT WITH CHILD NET  NICOOLE SLADE  AND

194  ANNIKA MCDONALD. IN ADDITION TO ANOTHER " FRAUD ON THE COURTS"  BY

195  DISQUALIFIED JUDGE KIRK VOLKER  OF HIS OWN ORDER IN THE FALSE SHELTER AFFIDAVIT  PG

196  9 LINE 17 . THE 4TH DCA  AS I CONTINUED APPEALING TO THE 4TH DCA. THE 4TH DCA

197  CONTINUED TO DENY ALL MY WRITS MY EXTRAORDINARY WRITS AND APPEALS  TO WHERE

198  THE 4TH DCA IN SUCH ACTS OF INDISCRETION AND THE INTEGRITY OF JUSTCE OF MY

199  FEDERALLY PROCETED RIGHTS OF THE U.SCONSTITITUION HAVE VIOLTED AND DEPRIVED ME

200  OF THE LIBERTIES AS A  BORN FREE U.S CITZSEN  IN SUCH DEPRIVATION IN THEIR ORDER TO

201  THE CLERK:

202  ORDERED that, on September 16, 2024, this Court issued an order requiring Petitioner to show cause

203  why sanctions should not be imposed for his abuse of judicial process and repeated filing of frivolous

204  documents after a prior warning. Petitioner has failed to timely respond to the order to show cause. For

205  the reasons set forth in the order to show cause, the Court imposes the sanction of no longer accepting

206  Petitioner's pro se filings. *Johnson v. Bank of New York Mellon Trust Co.*, 136 So. 3d 507, 508 (Fla. 2014).

207  The Clerk of this Court is directed to no longer accept any paper filed by Petitioner unless the document

208  has been reviewed and signed by a member in good standing of the Florida Bar who certifies that a good

209  faith basis exis

NEED TO WOORRY ABOUT HIM

210   THIS   UNCONSTITUTIONAL ORDER HAS ALLOWED AND PROVIDE A

211   PLATFORM FOR THE DEPRIVATIONS OD THE ATTORNRY'S AND THE

212   LOWER CIRCUIT COURTS TO NOT ONLY CONTINUE IN PROCEDDINGS OF

213   THE LOWER CIRCUIT WITHOUT JURISDICTION OR ANY LEGAL

214   STANDING , IT PROVIDEDS AND REAFFIEMS THE  ASSURANCE AND

215   PERMISSION FOR THE ATTONEY'S TO CONTINUE TO DISREGARD AND

216   VIOLATE THE FLORIDA BAR CODE OF PROFESSIONAL CONDUCT AS

217   THEY HAVE DONE PRIOR TO THIS ORDER FROM THE 4TH DCA AND

218   CONTINUE TO  DO SO WITH CONFIDENCE AND WITHOUT FEAR OF ANY

219   CONSEQUENCES DUE TO THE ORDER.

220

221

222

223

224

225                                   **COMPLAINT**

226

227   **1. DCF ATTORNRY DENISE WHEIS & JOSHUA SMITH VIOLATION OF FLORIDA**

228          **RULE OF PROFESSIONAL CONDUCT;**


NEED TO WOORRY ABOUT HIM

229    1. 4 8.3 rule regulating The Florida Bar?

230    • Under the "Reporting Professional Misconduct" rule, Rule 4-8.3, an

231        attorney is obligated to report another attorney's misconduct if the attorney

232        has actual knowledge of a misconduct that raises a substantial question as to

233        the offending attorney's "honesty, trustworthiness, or fitness as a lawyer in

234        other respects." ...

235

236    2. rule 3.3 in Florida?

237    A lawyer's reasonable belief that evidence is false does not preclude its

238    presentation to the trier of fact. The rule generally recognized is that, if necessary

239    to rectify the situation, an advocate must disclose the existence of the cli *Misleading*

240    *legal argument*

241    *Legal argument based on a knowingly false representation of law constitutes dishonesty toward*

242    *the tribunal. A lawyer is not required to make a disinterested exposition of the law, but must*

243    *recognize the existence of pertinent legal authorities. Furthermore, as stated in subdivision*

244    *(a)(3), an advocate has a duty to disclose directly adverse authority in the controlling*

245    *jurisdiction that has not been disclosed by the opposing party. The underlying concept is that*

246    *legal argument is a discussion seeking to determine the legal premises properly applicable to the*

247    *case.*

248    *False evidence*

NEED TO WOORRY ABOUT HIM

249    3.  .Subdivision (a)(4) requires that the lawyer refuse to offer evidence that the lawyer knows

250         to be false, regardless of the client's wishes. This duty is premised on the lawyer's

251         obligation as an officer of the court to prevent the trier of fact from being misled by false

252         evidence. A lawyer does not violate this rule if the lawyer offers the evidence for the

253         purpose of establishing its falsity.

254         If a lawyer knows that the client intends to testify falsely or wants the lawyer to

255         introduce false evidence, the lawyer should seek to persuade the client that the evidence

256         should not be offered. If the persuasion is ineffective and the lawyer continues to

257         represent the client, the lawyer must refuse to offer the false evidence. If only a portion

258         of a witness's

259

### Misleading legal argument

261    Legal argument based on a knowingly false representation of law constitutes dishonesty toward

262    the tribunal. A lawyer is not required to make a disinterested exposition of the law, but must

263    recognize the existence of pertinent legal authorities. Furthermore, as stated in subdivision

264    (a)(3), an advocate has a duty to disclose directly adverse authority in the controlling

265    jurisdiction that has not been disclosed by the opposing party. The underlying concept is that

266    legal argument is a discussion seeking to determine the legal premises properly applicable to the

267    case.

### Refusing to offer proof believed to be false

NEED TO WOORRY ABOUT HIM

269  *Although subdivision (a)(4) only prohibits a lawyer from offering evidence the lawyer knows to*

270  *be false, it permits the lawyer to refuse to offer testimony or other proof that the lawyer*

271  *reasonably believes is false. Offering such proof may reflect adversely on the lawyer's ability to*

272  *discriminate in the quality of evidence and thus impair the lawyer's effectiveness as an advocate.*

273  *A lawyer may not assist the client or any witness in offering false testimony or other false*

274  *evidence, nor may the lawyer permit the client or any other witness to testify falsely in the*

275  *narrative form unless ordered to do so by the tribunal. If a lawyer knows that the client intends*

276  *to commit perjury, the lawyer's first duty is to attempt to persuade the client to testify truthfully.*

277  *If the client still insists on committing perjury, the lawyer must threaten to disclose the client's*

278  *intent to commit perjury to the judge. If the threat of disclosure does not successfully persuade*

279  *the client to testify truthfully, the lawyer must disclose the fact that the client intends to lie to the*

280  *tribunal and, per 4-1.6, information sufficient to prevent the commission of the crime of perjury.*

281  *The lawyer's duty not to assist witnesses, including the lawyer's own client, in offering false*

282  *evidence stems from the Rules of Professional Conduct, Florida statutes, and caselaw.*

283  *Rule 4-1.2(d) prohibits the lawyer from assisting a client in conduct that the lawyer knows or*

284  *reasonably should know is criminal or fraudulent.*

285  *Rule 4-3.4(b) prohibits a lawyer from fabricating evidence or assisting a witness to testify*

286  *falsely.*

287  *Rule 4-8.4(a) prohibits the lawyer from violating the Rules of Professional Conduct or knowingly*

288  *assisting another to do so.*

NEED TO WOORRY ABOUT HIM

289    *Rule 4-8.4(b) prohibits a lawyer from committing a criminal act that reflects adversely on the*

290    *lawyer's honesty, trustworthiness, or fitness as a lawyer.*

291    *Rule 4-8.4(c) prohibits a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or*

292    *misrepresentation.*

293    *Rule 4-8.4(d) prohibits a lawyer from engaging in conduct that is prejudicial to the*

294    *administration of justice.*

295    *Rule 4-1.6(b) requires a lawyer to reveal information to the extent the lawyer reasonably*

296    *believes necessary to prevent a client from committing a crime.*

297    *This rule, 4-3.3(a)(2), requires a lawyer to reveal a material fact to the tribunal when disclosure*

298    *is necessary to avoid assisting a criminal or fraudulent act by the client, and 4-3.3(a)(4)*

299    *prohibits a lawyer from offering false evidence and requires the lawyer to take reasonable*

300    *remedial measures when false material evidence has been offered.*

301    *To permit or assist a client or other witness to testify falsely is prohibited by section 837.02,*

302    *Florida Statutes (1991), which makes perjury in an official proceeding a felony, and by*

303    *section 777.011, Florida Statutes (1991), which proscribes aiding, abetting, or counseling*

304    *commission of a felony.*

305    *Florida caselaw prohibits lawyers from presenting false testimony or evidence. Kneale v.*

306    *Williams, 30 So. 2d 284 (Fla. 1947), states that perpetration of a fraud is outside the scope of the*

307    *professional duty of an attorney and no privilege attaches to communication between an attorney*

308    *and a client with respect to transactions constituting the making of a false claim or the*

NEED TO WOORRY ABOUT HIM

309   *perpetration of a fraud. Dodd v. The Florida Bar, 118 So. 2d 17 (Fla. 1960), reminds us that*

310   *"the courts are . . . dependent on members of the bar to . . . present the true facts of each cause . .*

311   *. to enable the judge or the jury to [decide the facts] to which the law may be applied. When an*

312   *attorney . . . allows false testimony . . . [the attorney] . . . makes it impossible for the scales [of*

313   *justice] to balance." See The Fla. Bar v. Agar, 394 So. 2d 405 (Fla. 1981), and The Fla. Bar v.*

314   *Simons, 391 So. 2d 684 (Fla. 1980).*

315

316

317   **2.**
318        **RULE 4-3.3**

319   How to prove a false affidavit?

320   **1. After showing that a false statement or material omission was made, the**

321   **defendant must next show that the false statement or omission was made**

322   **either (1) knowingly and intentionally, or (2) with reckless disregard for the**

323   **truth. PLEASE SEE EXHIBIT #9 AND # 10  WHERE EXHIBIT #9 WAS USED**

324   **BY BOTH ATTORNRY'S WHERE THEY FILED FRIVILOUS MOTIONS**

325   **FALSLEY ALLEGING THAT I PERSONALLY THREATEN DCF ATTORNRY**

326   **DENISE WEHIS IN THE FACEBOOKPOST WHICH WAS USED TO SUSPEND**

327   **MY VISITION RIGHTS ORDERED BY DISQUALIFIED JUDGE KIRK VOLKER**

328   **AND EXHIBIT # 10 IN VIOLATION OF MY 6TH AMNENDEMNT RIGHT WHERE**

329   **THE DCF ATTORNRY'S PLACED MY PICTURE AND IN THE REGISTRY**

330   **WHEREAS TO THIS DATE I VANNOT ENTERER INTO A DFEDERAL DCF**

331   **BUILDING TO APPLY OR CHECK ON THE STATUE OF MY FOOD STAMP**

NEED TO WOORRY ABOUT HIM

332     **APPLICATION .THIS WAS DONE OUTSIDE OF COURT PROCEDDINGS**

333     **WHERE I HAVE NEVER BEEN CONTACTED WARNED INFORMED NOR IS**

334     **THERE ANY CASE NUMBER ASSIGNED TO THIS MALSISOUS AND FALSE**

335     **ALLEGATION BY  2 DCF ATTORNRY'S PENDING ON THE ACTIONOF THIS**

336     **FLORIDA BAR I AM FILING A 42 U.S.C 1983 CIVIL RIGHTS VIOLATION**

337     **LAWSUIT**

338                    **FOR EXAMPLE:**

339   **PURSUANT TO THE SAFTY PLAN AND THE FACT THAT THERE IS A**

340   **LEGAL NO TRESSPSS WARINING ON FILE OF THE W.P.B POLICE DEPT**

341   **. AGAINST THE MOTHER  PRIOR TO THIS POSENED SHELTER**

342   <u>**AFFIDAVIT OF DELBERATE FALSEHOODS OF THE SHELTER**</u> **AFFIDAVT**

343   **SUCH AS:**

344   **NOTICE THE SAME DATES  TWO DIFF  ALLEGATIONS ON THE SAME**

345   **DATE:  THE CHILDREN WERE NOT REMOVED?  WHY? THIS IS A**

346   **POORLY PLANNED CONSPIRCY ALONG WITH A POORLY PUT**

347   **TOGTHER  COLLECTION OF DELBERATE FALSEHOODS  MISLEADING**

348   **,INNACCURATE AND  OMMISSIIONS OF MATERIAL FACTS PUT**

349   **TOGERHTER AT THE LAST MINUTE TO JUSTFY  THE UNLAWFUL**

350   **SEISZER AND CURRENT  DETANMENT  OF MY MINOR CHILDREN**

351   **WITHOUT PROBABLE CAUSE OF WHICH THE DISQUALIFIED JUDGE**

NEED TO WOORRY ABOUT HIM

352 **ATTEMPTED TO VALIDATE WITH HIS VERSION MISREPRESENATIONS**

353 **OF MATERIAL FACTS./ "FRAUD ON THE COURTS**

354 **I CAN GO THROUGH THIS ENTIRE DOCUMERNTARY OF "FRAUD ON**

355 **THE COURT" PRESENTING UNDISPUTED <u>EVIDENCE OF THE</u>**

356 **<u>CONTRAY TO SUPPORT.</u>** THIS! I POINTED OUT TO THESE

357 ATTTORNRY'S IN THEIR MALISIOUS PROSECUTIONS.

358 02- Received on 6/30/2023. THIS DELIBERATE FALSELY WAS STATED BY BRIA ASKINS SHE FIRST

359 CAME ON SCENE JULY 1ST AT THE MOTEL WAS WHEN I FIRST MET HER . THE SECOND AND LAST TIME I

360 MET HER WAS ON AUGUST 10TH 2023 WHEN SHE ALONG WITH ANNIKA MCDONALD OF CHILD NET

361 UNLAWFULLY SEIZED MY CHILDREN AFTER I ASSGNED THEN IN AND DROPPED THEM IN TO DAY

362 CARE THAT DAY . . MRS BRIA WAS TOTALLY UNAWARE OF THE SAFTY PLAN AND UNIINFORMED OF

363 THE SAFTY PLAN OFTHE MOTHER, THAT IS WHY THE ADDED THE FABRICTION OF "THE MOTHER

364 MAKING IT BACK IN TIME BEFORE LAW ENFORCEMENT ARRIVED" . . BRIA WAS INFORMED OF THE

365 CHLD NEGLECT CHARGES, BUT NOT INFORMED AS THE CHARGES WAS WITHHELD. THE FATER

366 SUCESSFULLY COMPLETED PROBATION. THUS TOTALLY SHATERING THE FIRST DELBERATE FALSE

367 ALLEGATION WHICH IS :

368     A. <u>Abuse Report</u>

369 *Abuse Report# 2023-206533 Received 6/28/2023.*

370

371 It was reported the father has been driving with a suspended license. The father is currently on

372 probation for child neglect. **The father crashed his car with two of the children in the car and**

373 **total the car. It was reported he was asleep at the wheel. It has been reported that he also**

374 **fall** asleep at the daycare of the baby, just signing the child out. The daycare provider had to

NEED TO WOORRY ABOUT HIM

375   wake him up to get the child and was concerned about him getting home. He had the other

376   children with him. There was a previous report of him being asleep as the children roamed the

377   house. There is a history of substance misuse for the father. There is a concern for the safety of

378   the children in his care.

379   **IN MY MOTIION TO COMPEL TO PRODUCE ASK THE QUESTIONS WAS THE CHILDREN**

380   **REMOVED AT THAT TIME? WAS THE FATHER ARRESTED ? WHERE  IS THE POLICE OR**

381   **ACCIDENT REPODT? WHERE THE CHILDREN TAKEN TO THE HOSPITAL ? WHERE IS THE**

382   **DCFAND CHILDNET REPORT CONCERNING THE REMOVAL OF THE CHIDREN ? WHERE WERE**

383   **THE OTHER 2 CHILDREN A THE TIME OF THE ACCIDENT.**

384

385   **On 6/29/23,** Law Enforcement was called out because the children were found outside unattended

386   crying. The father left the children home alone. **The mother made it back home before** Law

387   Enforcement arrived on scene. This is not the first time the father has left the children home alone. This

388   has happened at least 3 - 4 times. In the past, the father was arrested for 3 counts of child neglect for

389   leaving the children home alone. The children's approximate ages are 3, 4 and 5.

390

391   -03 **Received on 6/30/2023. FALSEY <u>STATED BY BRIA ASKINS</u>**

392   The father left the children unattended last night at around 8:30. The father left the door to the

393   apartment open, and the children were crying. They were in and out of the apartment. Law

394   Enforcement was contacted. The father was seen running back to the apartment. Th father made it

395   back as Law Enforcement arrived. The father leaves the children alone. He normally leaves them alone

396   at night. The father uses profanity with the children. He has been heard yelling " get your m** f'ing

397   asses out..". **<u>The mother is not allowed to be around the children</u>**

NEED TO WOORRY ABOUT HIM

398

399 **WHO STATED THIS  FLASEHOOD ?   ANNIKA, NICOLE,  OR BRIA? OR ALL  BRIA  DID NOT KNOW**

400 **ABOUT SAFTY PLAN NICOLE AND ANNIKA DID.**

401   **On 07/15/2023**, someone called law enforcement to report that the father had hit two of the

402 children. Video surveillance at the hotel showed the father slapping the hands of two of the

403 children. It did not rise to the level of abuse. It appeared to be a corporal punishment type of

404 slap on the hands. The reporter was unsure which two children's hands were slapped.

405

406 The father stated that a DCF case worker set the family up in a hotel. The father is the sole

407 caregiver to the children. He has been caring for the children for the past four years by himself.

408 He is a having a very difficult time caring for the four young children. The hotel room was filthy.

409 There were dirty clothes and dirty sheets all over the hotel room. There were roaches in the

410 room. One of the children picked up a roach, and the father reported the roaches to the

411 management. The father said he doesn't receive very much money for food assistance. He is

412 already out of money for food, and the children need more food. The youngest children were

413 wearing very heavily soiled diapers.

414

415 The father needs child care so that he can get a job to try to support the family. He is in need of

416 further assistance. The mother is not involved in the lives of the children. **There is an order**

417 **against the mother stating that she is not allowed to see the children because she is on**

418 **drugs.  The father has been charged with child neglect in the past.**

NEED TO WOORRY ABOUT HIM

419

420                                    **3.**

421   **PURSUANT TO THE REMAINDER OF THE FALSE SHELTER AFFIDAVIT WHEREAS**

422      1. JULY 6TH 2023 DISQUALIFID JUDGE KIRK VOLKER SIGNED ACCCEPTING THE

423         RECOMMENDATIONS OF THE TERMINATION OF THE STATE COURTS JURISDICTION OF

424         THE CASE SEE EXHIBIT #11 .

425      2. ON DEC 16TH 2024 DURING THE UNLAWFUL TPR TRIAL FATHER  CROSS EXAMIEND THE

426         DAY CARE WORKER MRS DANIELLES WHO'S TESTIMONY WAS IS RETALITORY AS THE

427         DAY CARE WORKER STATED ON RECORD THAT SHE HAS A RIGHT TO SMOKE IN HER

428         HOME. THE DAY CARE WORKER DID NOT DENY BRINGING  MY 9 MONTH OLD INFANT

429         TO ME  HOLDING HIM WHILE SMOKING A LITE CIGARETTE . THE DAY  CAR WORKER

430         TESTIFYED THAT THEY HAVE PARENETS SIGN A DISCLOSRE BUT ADMITTED THAT THEY

431         DID NOT OFFER THE DISCLOSURE TO ME BECAUSE THEY STARTED IT AFTER MY

432         INFANT HAS STOP COMING TO HER DAY CARE.   THE DAY CARE WORKER TESTIFIED

433         THAT SHE DID NOT HAVE THE ALLEGED MAN  SIGN THE SIGNED OUT SHEET OF THE

434         ALLEGED MAN THAT I HAD ALLEGED TO HAVE SENT  OVER TO PICK UP MY INFANT DO

435         TO THE ALLEGED FACT THAT I  GOT INTO A CAR ACCIDENT.MRS DANIELS COULD NOT

436         PRODUCE AN PHYSICAL PROFF OF A SIGN OUT SHEET OR THE NAME OF THE ALLEGED

437         JOHN DOE THAT I SENT  TO PICK MY INFANT.

438      3. THE REMAINING FALSE ALLEGATIONS ARE PURSUANT TO THE TIME THAT MY FAMILY

439         WAS MOVED TO 3 DIFFERENT  DIRTY MOTELS WHERE ADDITIONAL FALSE

NEED TO WOORRY ABOUT HIM

440       ALLEGATIONS AND UNSUBSTANTIED BASELESS ALLEGATIONS WERE MADE  AND

441       ULTIMATLEY  EVERYTHING CAME TO FRUITITON AFTER THE FOLLOWING TETIMONY

442       WHICH WAS SUBMITTED IN A 36 PAGE APPELLATE BRIEF WHICH WAS DISMISSED BY

443       THE 4TH DCA NOT ALLOWING THE INCULPATORY EVIDENCE TO BE MADE KNOWN.

444   **4.            <u>BACKGROUND OF THIS CASE.</u>**

445       THE FATHER AND HIS CHILDREN WERE MOVED TO AN EXTENDED STAY MOTEL BY

446       CHILD NET. IN JULY 1ST 2023 THE T DAY OF THE FAMILY MOVE IN THE MOTEL A CPI

447       INVESTIGATOR NOW IDENTIFIED (BRIA ASKINS) CAME TO THE ROOM AS THE FATHER AND

448       THE CHILDREN WERE TRYING TO GET SETTLE IN AND ORGANIZE THEIR THINGS. THE

449       INVESTIGATOR TOOK PICTURES OF THE CHILDREN AS WELL AS LISTEN TO THE FATHER AS

450       THE FATHER DID NOT HIDE THE FACT OF HIS DISAPPOINTED AND ISSUES WITH NICOLE

451       SLADE AND THE EVENTS THAT HAPPENED PRIOR TO THEM MOVING TO THE MOTEL. THE

452       CPI INVESTIGATOR ON HER OWN ORDER SUPPLIES FOR THE FAMILY NOT BY REQUEST OF

453       THE FATHER. THE FATHER HAD ALREADY HAD AN ABUNDANCE OF SUPPLIES FOR HIS

454       CHILDREN. THE CHILDREN WERE NOT REMOVED FROM THE FATHER AS THERE WERE NO

455       ISSUES CONCERNS THAT THE CHILDREN MIGHT BE AT RISK OR ANY INDICATION THAT

456       THAT THE FATHER IS UNABLE TO CARE FOR THE CHILDREN. THE 1ST WEEK AT THE MOTEL

457       THE FATHER NOTICE THE APPEARANCE OF SEVERAL DIFFERENT TYPES OF BUGS NOW

458       STARTED TO APPEAR AFTER GOING TO THE MOTEL MANAGER THE MANGER MADE IT

459       KNOWN THAT THAT ONLY FULL SERVICE CLEAN THE ROOMS ONCE EVERY 2 WEEKS AND

460       THE REST WOULD BE THE RESPONSIBILITY OF THE GUEST. THE FATHER MAKE IT KNOWN

NEED TO WOORRY ABOUT HIM

461    THAT THEY JUST LEFT A SITUATION WHERE BUGS WERE THE ISSUE WITHOUT ARGUMENT

462    OR BEING KICKED OUT THE HOTEL MANAGER AFTER BEING AWARE OF THE ISSUE STATED

463    THAT SHE WILL NOT EXTEND THE STAY AT THE ROOM AS SHE HAD TO CONSIDER LIABILITY

464    ISSUES.   THE ISSUE WAS MADE KNOWN TO NICOLE SLADE, AND THE FAMILY WAS MOVED

465    OUT OF THE EXTENDED STAY AND MOVED INTO THE 2 MOTEL CALLED INN TOWN SUITES.

466    5. UPON ARRIVING AND MOVING IN THE INTOWN SUITES MOTEL THE MOTEL APPEARED

467    CLEAN HOWEVER, 15 MINUTES AFTER ALL THE FAMILY THINGS WERE MOVED INTO  A

468    SMALL ROOM CONSISTING OF ONLY 2 BEDS THE CHILDREN DISCOVERED DEAD

469    ROACHES UP UNDER THE BED THE FATHER THEN BEGAN TO THOROUGHLY EXAMINED

470    THE ROOM AND DISCOVERED MORE DEAD ROACHES  THE TOP SHEETS WERE CLEAN

471    HOWEVER THE LOWER SHEETS WERE NOT THE ROOM CONSISTED OF DUST AND DEBRI

472    . THE FATHER CALLED THE CASE WORKER THE SAME DAY TO COMPLAIN OF THE ISSUES

473    AND THE ROOM AND ALSO OF THE HAZARDOUS  ISSUES FOR HIS 4 3 2 AND 9 MONTH

474    OLD INFANT THE CASE WORKER COULD NOT BE REACHED THE FATHER  MAKE SEVERAL

475    VIDEOS AND SEND IT TO THE CASE WORKER  HIS FORMER ATTORNEY AND TO HIS DCF

476    DELEGATES . THE ATTORNEY FOR THE FATHER AND THE CASE WORKER NICOLE SLADE

477    WERE UNREACHABLE OR DID SHE RESPOND. THE NEXT DAY THE FATHER GATHER ALL

478    HIS CHILDREN AND WENT DOWN TO THE FRONT OFFICE TO COMPLAIN AND ASK FOR

479    A CLEANER ROOM. WHILE IN THE OFFICE INFORMING THE MANGER  , THE  FATHERS

480    5YEAR OLD SON WAS RUNNING AROUND PUTTING HIMSELF IN DANGER OF BEING

481    SERIOUSLY HURT THE FATHER GATHER HIS SON SAT HIM DOWN AND GAVE HIM A TAP

482    ON THE HAND IN FRONT OF THE CAMERA AND EXPLAINED TO HIS SON WHIY HE WAS

NEED TO WOORRY ABOUT HIM

23

483       BEING DISCIPLINED , THE HOTEL MANAGER CONFRONTED  THE FATHER ABOUT

484       DISCIPLINING HIS CHILD , THE FATHER ENGAGED THE CONVERSATION BY ASKING THE

485       MANAGER WHY DID HE PUT HIM AND HIS CHILDREN IN SUCH A FILTHY AND UNSAFE

486       ROOM . THE MANGER STATED THAT HE WILL CALL THE CASE WORKER SO THAT WE

487       MAY LEAVE THE MOTEL.  WHILE THE FATHER PROCEED TO PACK UP THEIR THINGS THE

488       RIVIERA BEACH POLICE RESPONDED WITH ANOTHER CPI INVESTIGATOR. THE FATHER

489       CONSENTED TO A DRUG TEST ON THE SPOT WHICH CAME BACK NEGATIVE. THE

490       FATHER EXPLAINED TO THE OFFICER AND CPI INVESTIGATOR WHY THEY WERE

491       PACKING UP AND SHOWED THEM THE ROACHES AND BUGS IN THE MOTEL ROOM.

492       THE FATHER EXPLAINED THAT THE CASE WORKER NICOLE SLADE IS NOT ANSWER HIS

493       PHONE CALLS. THE CHILDREN WERE NOT REMOVED FROM THE FATHER AS THERE

494       WERE NO ISSUE OR CAUSE TO DUE TO THE CHILDREN WERE NOT AT RISK OR IN

495       DANGER NOR NEGLECTED.

496    6. ON MONDAY THE ASSISTANT FOR THE CASE WORKER RESPONDED IN A PHONE TEXT

497       STATING THAT CHILDNET HAS BOOKED THE FAMILY AT THE MOTEL SIX AND IT WAS

498       THE FATHERS RESPONSIBILITY TO TRANSPORT THE FAMILY'S PERSONAL BELONGINGS

499       TO THE MOTEL. WHILE THE CHILDREN WERE IN DAYCARE THE FATHER WENT TO THE

500       LORD'S PLACE AND SPOKE WITH GARY HAWKINS WHO WAS ABLE TO SECURE A CAR

501       AND ASSISTED THE FATHER IN TRANSPORTING THE FAMILY PERSONAL BELONGS TO

502       THE 3RD MOTEL, MOTEL 6. DURING THE STAY AT THE MOTEL WAS AGAIN THE ISSUE

503       WITH BUGS AND ROACHES WERE AN ISSUE. THE FATHER TRIED TO ENDURE

504       HOWEVER, ON A THURSDAY AS HE WAS PREPARING HIS CHILDREN FOR DAYCARE, HE

NEED TO WOORRY ABOUT HIM

505    NOTICED NUMEROUS RED BUMPS ON HIS DAUGHTERS LEG. THE FATHER RUBBED HIS

506    DAUGHTERS LEG WITH OINTMENT AND WHEN HE REACHED THE DAT CARE THE

507    FATHER MADE IT KNOWN TO THE STAFF THAT THE BUMPS OCCURRED AT THE MOTEL

508    WHERE STAYING. THE DAYCARE DOCUMENTED THE ISSUE. THAT ON SATURDAY

509    MORNING OF THE SAME WEEK, THE FATHERS 9 MONTH OLD SON WAS CRYING OFF

510    AND ON THROUGH THE NIGHT,. EARLY THE SAME MORNING THE FATHER NOTICED

511    RED BUMPS ALOVER HIS 9 MONTH OLD SON THE FATHER CALLED 911 TO THE MOTEL

512    THE PARAMEDICS ARRIVE AND CHECK THE BABY'S VITALS, ALTHOUGH EVERYTHING

513    WAS FINE THEY RECOMMENDED THAT THE BABY BE SEEN BY THE PEDIATRICIAN. THE

514    PARAMEDICS DISCOVERED AND DETERMINED THAT THE CHILDREN WERE BEING

515    BITTEN BY BED BUGS. THE FATHER AGAIN REACHED OUT TO NICOLE SLADE AND HIS

516    ATTORNEY ALL OF WHICH THE FATHER HAD BOTH OF THEM ALONG WITH HIS DCF

517    DELEGATES ON A GROUP TEXT.ONCE AGAIN NEITHER ATTORNEY NOR CASE WORKER

518    MADE THEMSELVES AVAILABLE.            THE FATHER WENT TO THE FRONT OFFICE

519    TO REPORT THE ISSUE. THE MANAGER ON DUTY STATED THAT THEY WOULD MOVE

520    THE FATHER AND THE KIDS TO ANOTHER ROOM HOWEVER THEY HAD TO CHECK OUT

521    AND RE CHECK BACK IN BECAUSE THE PARAMEDICS WERE CALLED.LATER THAT DAY IN

522    THE AFTERNOON, THE FATHER WENT DOWN TO THE HOTEL OFFICE TO EXCHANGE

523    ROOMS. THE MORNING STAFF HAD GONE THAT DAY AND THE AFTERNOON

524    INDIVIDUAL PERSONAL WAS THERE. EVERYTHING WAS GOING OK, HOWEVER THE

525    FATHERS SON STARTED MISBEHAVING RUNNING UP TO STRANGERS RUNNING

526    AROUND YELLING AND NOT LISTENING TO THE FATHERS INSTRUCTIONS. SO THE

NEED TO WOORRY ABOUT HIM

527    FATHER ONCE AGAIN DISCIPLINE HIS SON AND SPANKED HIM ON HIS BACKSIDE WITH

528    AN OPEN HAND THE MOTEL CLERK THAT WAS THERE TOLD THE FATHER NOT TO HIT

529    HIS CHILDREN THE FATHER RESPONDED AND WORDS WERE EXCHANGED BETWEEN

530    THE FATHER AND THE CLERK . THE CLERK CALLED THE POLICE ALLEGING THAT THE

531    FATHER THREATEN HIM POLICE ARRIVED HOWEVER NOT FOR THE CHILDREN, THE

532    POLICE STATED THAT THE HOTEL MANAGER WANTED THEM TO LEAVE. THE FATHER

533    AGAIN CALLED CASE MANAGER NICOLE SLADE. SHE NEVER RESPONDED, HOWEVER,

534    THE POLICE CALLED THE CASE MANAGER AND MADE HER AWARE OF THE ISSUES. THE

535    CASE WORKER STATED THAT SHE WOULD TAKE CARE OF IT. ALSO PRIOR TO THIS

536    INCIDENT A 3RD CPI INVESTIGATOR VISITED THIS MOTEL.    THE FATHER ONCE AGAIN

537    MADE IT KNOWN TO THE CPI INVESTIGATOR OF THE BUG INFESTATION IN JUST

538    ABOUT EVERY MOTEL THEY HAVE BEEN IN. THE INVESTIGATOR TOOK PICTURES OF

539    THE CHILDREN LOOK AROUND THE ROOM. HOWEVER, THE CHILDREN WERE NOT

540    REMOVED FROM THE FATHER BECAUSE THEIR WERE NO ISSUES OR CONCERNS THAT

541    HIS CHILDREN MIGHT BE AT RISK OR NEGLECT.  AS THE FATHER WAS WAITING TO

542    HEAR FROM CASE MANAGEMENT, THAT SUNDAY A TEXT WAS SENT TO THE FATHERS

543    PHONE THAT THE RESERVATION WAS BOOKED FOR THE FAMILY AT HOME 2 SUITES BY

544    HILTON. THE FATHER AND THE CHILDREN STAY AT THE MOTEL THAT NIGHT AS THEY

545    WERE WAITING TO FIND SOMEONE TO MOVE THEM OVER TO THE 4TH MOTEL. THAT

546    SUNDAY MORNING UNFORTUNATELY, THE FATHERS 9-MONTH-OLD SON HAD

547    DEVELOPED HAND, FOOT AND MOUTH VIRUS AND IT WAS SEVERELY SPREADED ALL

548    OVER THE 9-MONTH-OLD BABY THE FATHER ONCE AGAIN REACHED OUT IN THE

NEED TO WOORRY ABOUT HIM

549    GROUP TEXT TO MAKE THE CASE MANAGER KNOWN OF THE LATEST INCIDENT WITH

550    HIS SON. THAT SUNDAY A FRIEND OF THE FATHER MOVED THEM TO THE NEW MOTEL

551    BY HILTON. IT IS ALSO FROM THAT MOTEL THAT THE FATHER SCHEDULE A PORTAL

552    VISIT WITH PEDIATRIC ASSOCIATES FOR HIS SON, THE INFANT WAS SEEN VIA ZOOM

553    AND MEDICATION WAS PRESCRIBED WITH A FOLLOW UP IN PERSON VISIT THREE

554    DAYS LATER.  DURING THE FATHERS 2 WEEK STAY AT THE HILTON MOTEL, IT WAS

555    WITHOUT ANY ISSUES OR INCIDENTS NO BUG PROBLEMS NO STAFF PROBLEMS

556    EVERYTHING WAS WELL AND THE FATHER LEFT THE MOTEL WITH GOOD STANDING.

557    WHILE AT THE HILTON THE FATHER WOULD DROP THE OTHER 3 KIDS OFF TO DAY

558    CARE HOWEVER,  HE WOULD KEEP THE 9 MONTH OLD WITH HIM AS THE INFANT WAS

559    RECOVERING FROM HAND FOOT AND MOUTH. THE FATHERS JOIB AT WENDYS WAS

560    STILL INTACT HOWEVER DUE TO REMODELING, THE FATHER WAS STILL OUT OF WORK

561    TEMPORARY SO THE FATHER USED THAT TIME TO LOOK FOR HOUSING. THE FATHER

562    WENT TO ADOPT A FAMILIES AND TALKED WITH ABBY HARTMEN WHO HAD HELPED

563    THE FAMILY PRIOR.  IT HAD BEEN 4 YEARS SINCE THE FATHER WAS IN THE ADOPT A

564    FAMILY PROGRAM. THE FATHER REACHED OUT TO MRS ABBY ONLY TO ASK FOR

565    ASSISTANCE IN FINDING A 3 BEDROOM APARTMENT OR HOUSE. UNKNOWINGLY TO

566    THE FATHER, MRS HAETMAN REFERRED THE FATHER OVER TO FAMILY PROMISE OF

567    MRS MAYS.  THE FATHER WAS ABLE TO ALSO ENROLLED HIS 5 YEAR OLD SON AND

568    REGISTER HIM FOR SCHOOL AT U.B KINSEY ELEMENTARY SCHOOL.. AROUND AUGUST

569    8TH THE FATHER GOT A TEXT FROM MRS HARTMAN STATING THAT THEIR NEW

570    ADDRESS WOULD AN ADDRESS IN LAKE WORTH WHERE FAMILY PROMISE AGREED TO

NEED TO WOORRY ABOUT HIM

571          PUT THE FAMILY UP IN TEMPORARY SHELTER. UNKNOWINGLY AT THE TIME THE

572          TEMPORARY SHELTER WOULD BE FOR ONLY 30 DAYS AGAIN UNKNOWINGLY TO

573          EVERYONE ELSE WHO WAS UNDER THE IMPRESSION THAT THE TEMPORARY SHELTER

574          WOULD BE FOR 90 DAYS.  HOWEVER, REGARDLESS OF THE STAY THE FATHER STATED

575          THAT TO MOVE IN A MOTEL TEMPORARY IN ANOTHER CITY WOULD CREATE AN EVEN

576          BIGGER BARRIER DUE TO THE FACT THAT THE FATHER RELIES ON THE BUS SYSTEM,

577          THE FATHER JOB IS IN WEST PALM BEACH SO IS HIS CHILDREN DAY CARE AND THE

578          FACT THAT HIS SON IS STARTING HIS FIRST DAY OF SCHOOL IN 2 DAYS. THE FATHER

579          WOULD TO DO EVERYTHING ALL OVER AGAIN AND HE WAS NOT FAMILIAR WITH LAKE

580          WORTH AND THAT MOVED WOULD BE TOO MUCH OF A BARRIER AND CHALLENGE.

581          THE FATHER RECEIVED A TEXT FROM NICOLE SLADE AND ADVISED ABBY HARTMEN

582          THAT IF THE FATHER DOES NOT TAKE THE TEMPORARY SHELTER THAT THEY WOULD

583          NEED TO CHECK OUT OF THE MOTEL IN THE MORNING.  THE FATHER BRIEFLY AND

584          FINALLY GOT IN TOUCH WITH HIS ATTORNEY TO SEE IT THERE WERE OTHER

585          RESOURCES HE COULD REACH OUT TO FOR  ANY  ASSISTANCE WITH HOUSING. THE

586          ATTORNEY TOLD THE FATHER THAT HE DOES NOT TAKE THIS TEMPORARY SHELTER

587          THAT THEY WERE GOING TO TAKE HIS CHILDREN BECAUSE THEY HAD NO PLACE TO

588          LIVE. THE FATHER TURNED DOWN THE SHELTER OFFER AND STARTED WALKING OVER

589          TO FAMILY PROMISE  WITH HIS CHILDREN TO EXPLAIN WHY IT WAS NECESSARY  DUE

590          TO THE FACT THAT THE MOVE TO ANOTHER CITY AT THE SPUR OF THE MOMENT IS

591          TOO MUCH OF A CHALLENGE  AS THEY WANTED THE FATHER TO  MOVE IMMEDIATELY

592          WHILE ON THE WAY TO THE FAMILY PROMISE OFFICE STATE REPRESENTATIVE

NEED TO WOORRY ABOUT HIM

593    JAVONTE EDMONDS  SAW THE FATHER AND HIS CHILDREN AND STOPPED

594    IMMEDIATELY TO FIND OUT WHAT WAS GOING ON THE FATHER EXPLAINED TO THE

595    STATE REPRESENTATIVE OF WHAT HAS BEEN HAPPENING WITH HIM  AND HIS

596    CHILDREN THE DIRTY MOTELS THEY WERE SEND TO UP TO BEING  GIVEN AN

597    ULTIMATUM BY THE CASE WORKER NICOLE SLADE THAT IF HE DID NOT TAKE THE

598    TEMPORARY HOUSING, HE NEED TO CHECK OUT OF THE MOTEL BECAUSE CHILD NET

599    WE'RE NOT GOING TO ASSIST ANY FURTHER. THE STATE REPRESENTATIVE HAD THE

600    FATHER TO CALLED THE CASE WORKER ONLY AGAIN TO INQUIRY   ABOUT

601    ALTERNATIVE ASSISTANCE AND WHAT MORE CAN BE DONE TO ASSIST THE FAMILY

602    WITH HOUSING.THE SAME THING AS WITH SENATOR BOBBY POWELL. SOMEHOW THE

603    CALL GOT DISCONNECTED. THE STATE REPRESENTATIVE ASK THE FATHER IF HE

604    WOULD LIKE THE FATHER TO GO WITH HIM TO DR MAYS OF FAMILY PROMISE. SO THE

605    FATHER WELCOME HIM TO ASST HIM. WHEN WE GOT TO THE OFFICE THE

606    REPRESENTATIVE EXPLAINED TO THE DIRECTOR CEO OF FAMILY PROMISE WHY THEY

607    WERE THERE AND WHY HE TURNED DOWN GOING TO LAKE WORTH. SO, THE FATHER

608    DR MAYS AND THE STATE REPRESENTATIVE STARTED BRAINSTORMING OTHER

609    RESOURCES TO HELP THE FATHER WITHOUT MOVING TO LAKE WORTH. WHILE THEY

610    WERE BRAINSTORMING, THE STATE REPRESENTATIVE WAS HOLDING THE FATHERS 2

611    YEAR IN HIS LAP. UNFORTUNATELY, THE 2-YEAR-OLD POOPED AND IT SEEKED

612    THROUGH THE PAMPER AND ON TO THE REPRESENTATIVE PANTS, SO MR JOVONTE

613    HAD TO LEAVE.  HOWEVER BEFORE LEAVING THE STATE REPRESENTATIVE PAID FOR

614    AN EXTRA NIGHT AT THE HILTON FOR THE FAMILY SO THAT THEY MAY BE GIVEN TIME

NEED TO WOORRY ABOUT HIM

615       TO FIND STORAGE FOR THEIR BELONGINGS.  DR MAYS STATE THAT SOME ELSE HAD

616       TOOK THE FATHERS SPOT BUT THEY CAN ASSIST THE FATHER WITH 5 DAYS UNTIL

617       THEY CAN CONNECT WITH SOME MORE RESOURCES TO KEEP THE FATHER IN WEST

618       PALM BEACH HOWEVER THE MOTEL WOULD STILL BE IN LAKE WORTH. THE FATHER

619       AND THE CHILDREN WERE ON THE VERGE BUT NOT COMPLETELY WITHOUT SHELTER.

620       THE FATHER HAD AT LEAST 6 DAYS BEFORE BEING TOTALLY WITHOUT SHELTER.

621       HOWEVER, ON THE FIRST DAY OF SCHOOL IT WAS A VERY EXCITING MOMENT AND

622       MILESTONE FOR THE SINGLE FATHER THAT RAISE ALL HIS CHILDREN WITHOUT A

623       MOTHER AND BY HIMSELF, HIS SON WAS HEADED TO KINDERGARTEN TO BEGINNING

624       A NEW STAGE OF HIS DEVELOPMENT.  AFTER DROPPING HIS SON OFF TO SCHOOL IN A

625       VERY PROUD YET EMOTIONAL MOMENT, THE FATHER THEN PROCEED TO DROP OFF

626       HIS 2 AND 3-YEAR-OLD TO DAYCARE. AS THE FATHER APPROACHED THE DAY CARE HE

627       NOTICE SEVERAL POLICE CARS ALREADY AT THE DAYCARE. THE FATHER PROCEED IN

628       AND CHECKED HIS 2 CHILDREN IN THE DAYCARE. THE FATHER THE FATHER PROCEED

629       FROM THE DAYCARE TO GO OVER TO HIS JOB TO CHANGE HIS SONS PAMPER, EVEN

630       THOUGH THE RESTAURANT WAS STILL CLOSED INSIDE FOR REMODELING. THE

631       BATHROOM WAS OPEN. AS THE FATHER WAS LEAVING THE DAYCARE THAT WAS

632       WHEN THE FATHER WAS APPROACHED BY THREE OFFICERS( WPB POLICE)  WHO

633       STATED THAT THEY WERE THERE TO TAKE HIS CHILDREN INTO CUSTODY, MY 5 YEAR

634       OLD SON WAS ALSO PICKED UP FROM U.B.KINSEY ELEMENTARY SCHOOL ON HIS VERY

635       FIRST DAY OF SCHOOL AND UNLAWFULLY TAKEN INTO CUSTODY BY DCF.  FOR

636       EMOTIONAL REASON THE FATHER WILL STOP HERE   STATING THAT THAT HIS

NEED TO WOORRY ABOUT HIM

637        CHILDREN WERE UNLAWFULLY TAKING INTO CUSTODY ON AUGUST 10, 2023

638        UNLAWFULLY AND MALICIOUSLY TO THE FACT THAT THE FATHER REFUSED TO ACCEPT

639        WHAT WOULD HAVE BEEN ONLY A 30 DAY SHELTER PLACEMENT BY FAMILY PROMISE

640        FOR ONLY 30 DAYS IN LAKE WORTH WITH THE VERY SAME EXTENDED STAY MOTEL

641        COMPANY AS THE FIRST EXTENDED STAY MOTEL ON 45TH STREET. THE MOTEL WAS

642        LOCATED OFF OD 1-95 ON 1OTH AVE NORTH IN LAKE WORTH. THE FATHER WAS

643        UNFAMILIAR WITH THE BUS SCHEDULE, THE DAYCARE, AND THE SCHOOLS WHEREAS

644        THE FATHER NOT ONLY RELIED ON PUBLICE TRANSPORTATION, THE FATHER SON WAS

645        ENROLLED IN SCHOOL, HIS 2 AND 3-YEAR-OLD WAS ALREADY IN DAYCARE. THE

646        FATHER JOB AT WENDY; S RESTURANT WAS ONE BLOCK AWAY FROM THE

647        DAYCARE.WERE HIS 2 AND 3 YEAR OLD ATTENDED THE HIS 9 MONTH OLD SON WAS

648        RECOVERING FROM BED BUG BITES AND THE  HAND FOOT AND MOUTH VIRUS AND

649        WAS NOT MEDICALLY CLEARED TO BE ENROLLED BACK IN DAYCARE. THE FATHER AND

650        HIS CHILDREN WERE NOT WITHOUT SHELTER DURING THE TIME THAT HIS CHILDREN

651        WERE UNLAWFULLY REMOVED FROM HIS CUSTODY ON AUGUST 1O, 2023 BASED ON

652        A MALICIOUS AND EGREGIOUS FILING OF SHELTER AFFIDAVIT BY DCF RELYING ON THE

653        INFORMATION BY CHILDNET EMPLOYEE DIRECTOR OF CASE MANAGERS AND MY CASE

654        MANAGER AT THE TIME NICOLE SLADE ACTING IN CONCERT WITH ANIKKA MC

655        DONALD  ALSO OF CHILD NET THAT PROVIDE FALSE ,MISLEADING, INACCURATE

656        INFORMATION WITH OMISSION OF MATERIAL FACTS OF WHICH THAT DOES NOT

657        HAVE A SWORN AFFIRMATION OF TRUTH AND THE FACT THAT THE DCF ATTORNEY

658        DENEIS WEIHS KNEW OF THE DELIBERATE FALSEHOODS AND THAT SHE WOULD BE

NEED TO WOORRY ABOUT HIM

659    UNABLE TO PRESENT AND PHYSICAL PROOF OR PHYSICAL EVIDENCE  TO MEET HER

660    BURDEN TO PROVE THE UNSUBSTANTIATED, UNSUPPORTED INFORMATION, YET THIS

661    ATTORNEY BEING AWARE MALICIOUSLY PERSUED THIS ISSUE WITH RECKLESS

662    DISREGARD OF THE TRUTH. IN ADDITION WHILE AT THE EXTENDED STAY MOTEL

663    UNDER THE FAMILY PROMISE PROGRAM ON AUGUST 23 2023. LOCATE AT THE FUN

664    DEPOT NEXT TO THE MOTEL WHERE THE APPELLANT WAS LIVING  FORMER CASE

665    MANAGER HILLARY GARSON ( WHO HAS QUIT THE CHILDNET AS CASE MANAGER

666    AFTER THE FATHER CALLED IN A N ABUSE REPORT OF CHILD NEGLECT AGAINST

667    HER.ON AUGUST 23 2023 H=THE CASE WORKER AT THE TIME  BROUGHT THE

668    APPELLANT CHILDREN TO VISITATION . THE CHILDNET CASE WORKER BROUGHT THE

669    APPELLANT AT THE 9 MONTH OLD BABY OUT IN PUBLIC AT A PLACE OF BUSINESS (

670    THE FUN DEPOT) THE BABY WAS ALREADY SEVERELY SOILED IN A WET DIAPER WHEN

671    THE FATHER ARRIVED. IT WAS ALSO DISCOVERED THAT THE CASE WORKER NOT ONLY

672    DELIVERED THE BABY  A SOILED DIAPER, THE CASE WORKER DID NOT BRING NOR WAS

673    ANY OF THE ITEMS AVAILABLE ; THE BABY WAS HUNGRY AND HAD NO FORMULA

674    THERE WAS NO DIAPERS TO CHANGE THE BABY  WAS BAREFOOT , NO SHOES, NO

675    SOCKS, NO BABY SEAT, THE BABY HAD SWOLLEN GUMS AND A RUNNY NOSE. THE

676    FATHER CALLED THE DIRECTOR OF CASE MANAGEMENT NICOLE SLADE . THE FATHER

677    ASK TO GO TO HIS MOTEL ROOM TO GET ALL THE ITEMS FOR THE BABY. MRS SLADE

678    STATED THAT SHE WILL GO PURCHASE THE ITEMS AS SHE WANTED THE FATHER TO

679    ENJOY HIS VISIT. WHEN NICOLE SLADE RETURNED WITH THE ITEMS THE FATHER

680    REQUESTED A NIBBLE TO SCREW ON TO THE READT MADE FORMULA. T NICOLE SLADE

NEED TO WOORRY ABOUT HIM

681      THOUGHT THAT THE READY MADE FORMULA CAME WITH THE NIPPLE AS SHE

682      REFERRED TO THE PICTURE ON THE BOX. THE FATHER HAD TO EXPLAIN AND SHOW

683      THE DIRECTOR THAT IT DID NOT  FOR WHICH THE DIRECTOR HAD TO GO BACK OUT

684      AND PURCHASE NIPPLES FOR  TO BE ATTACHED TO THE FORMULA SO THAT  THE BABY

685      CAN FEED. THIS ABUSE REPORT WAS IMPROPERLY INVESTIGATED AS THE FATHER

686      VEHEMENTLY COMPLAINED AT A JUDICIAL REVIEW HELD IN SEPTEMBER THAT THE

687      INVESTIGATOR ADMITTED THAT SHE DID  NOT INTERVIEW THE WITNESS WHICH WERE

688      THE EMPLOYEES AT THE FUN DEPOT WHO ASSISTED THE A FATHER  AS MUCH AS THEY

689      COULD UNTIL THE DIRECTOR WAS ABLE TO GATHER EVERYTHING THE BABY NEED.

690    **7.**          **<u>UNDISPUTED</u>**

691    **8.** <u>THE APPELLANT IS A GOOD AND LOVING FATHER AND PROVIDER OF HIS CHILDREN</u>

692      <u>PRIOR TO HIS CHILDREN BEING UNLAWFULLY REMOVED FROM HIS CUSTODY</u>

693      <u>PURSUANT TO FRAUDULENT FILINGS OF FALSE STATEMENTS OF MATERIALS FACTS  BY</u>

694      <u>JUDGE KIRK VOLKER AND DCF IN COURT DOCUMENTS .THE CHILDREN AND THE</u>

695      <u>FATHER WERE NOT WITHOUT SHELTER. THE CHILDREN WERE UP TO DATE IN THEIR</u>

696      <u>IMMUNIZATIONS  THERE WERE 4 UNSUCCESSFUL VINDICTIVE ATTEMPTS TO REMOVE</u>

697      <u>HIS CHILDREN WITHOUT SUCCESS. 1ST  A MALICIOUS ATTEMPT ACTING IN BAD FAITH</u>

698      <u>THE VOLUNTEER GUARDIAN AT LITEM FALSE ABUSE REPORT CALLED IN BY THE</u>

699      <u>FATHER OF WHICH THE CASE MANAGER NICOLE SLADE WAS AWARE , AND AVAILABLE</u>

700      <u>OF THE ISSUES FOR WHICH CHILD PROTECTIVE SERVICE  ARRIVED TO THE APPELLANTS</u>

701      <u>APARTMENT WITH SEVERAL W.P.B POLICE OFFICERS THE INVESTIGATOR TOOK</u>

NEED TO WOORRY ABOUT HIM

702    PICTURES OF THE CHILDREN INTERVIEWED THE FATHER AND ADMINISTERED AN ON

703    SITE DRUG TEST TO THE FATHER WHICH WAS NEGATIVE. THE CPI INVESTIGATOR

704    DETERMINED THAT THE CHILDREN WERE IN NO IMMEDIATE RISK HARM OR DANGER

705    OF ABUSE OR NEGLECT THE CHILDREN REMAINED IN THE CARE OF THE APPELLANT

706    THE CASE WAS CLOSED 30 DAYS LATER.  2ND A VINDICTIVE  REPORT BY THE

707    APPELLANT (S) LANDLORD 0N 6/30/2023 THE WPB POLICE OFFICERS RESPONDED

708    INTERVIEWED THE FATHER  LOOKED OVER THE APARTMENT LOOKED OVER THE

709    CHILDREN AN DETERMINED THAT THE CHILDREN WERE IN NO IMMEDIATE HARM OR

710    DANGER OF ABUSE AND NEGLECT THE CHILDREN REMAINED IN THE CARE OF THE

711    FATHER.  1 DAY LATER PURSUED BY CASE WORKER NICOLE SLADE. A 2ND CPI

712    INVESTIGATOR APPEARED AT THE EXTENDED STAY MOTEL WHERE THE FATHER WAS

713    IN THE PROCESS OF  GETTING SETTLE IN AS  THE FATHER HAD JUST CHECKED IN ON

714    THE 1ST OF JULY. THE CPI INVESTIGATOR INTERVIEWED THE FATHER TOOK PICTURES

715    OF THE CHILDREN THE FATHER DID NOT HOLD BACK HIS ISSUES  HE HAS BEEN HAVING

716    WITH THE CASE WORKER. A DRUG TEST WAS GIVEN TO THE FATHER WHICH WAS

717    NEGATIVE THE CHILDREN REMAINED IN THE CARE OF THE FATHER AS THERE WERE NO

718    CONCERNS THAT THE CHILDREN WERE AT RISK OF ABUSE NEGLECT OR IMMEDIATE IN

719    DANGER OF ABUSE. THE CPI WORKER VOLUNTEERED TO PROVIDE THE APPELLANT

720    WITH ADDITIONAL SUPPLIES PAMPERS WIPES ETC.. FOR THE FATHER. THE FATHER DID

721    NOT REQUEST AS HE HAD AN ABUNDANT SUPPLY OF THE ITEMS DOE HIS CHILDREN.

722    3RD AT THE INN TOWN SUITES MOTEL BASED ON  YET VINDICTIVE EFFORTS , IT IS

NEED TO WOORRY ABOUT HIM

723    ALLEGED THAT A  UNIDENTIFIED MOTEL WORKER CALLED IN AN ALLEGED ABUSE

724    REPORT AGAINST THE FATHER AS THE FATHER COMPLAINED OF A DIRTY ROOM

725    INFESTED WITH BUGS TO THE HOTEL MANAGER,  A3RD COPT INVESTIGATOR

726    ARRIVED WITH THE RIVIERA BEACH POLICE OFFICER.  A DRUG TEST WAS

727    ADMINISTERED ON THE SPOT TO THE FATHER WHICH WAS NEGATIVE, PICTURES WERE

728    TAKEN  OF THE CHILDREN AND THE FATHER INTERVIEWED. THE CHILDREN WERE NOT

729    REMOVED FROM THE FATHER AS IT WAS DETERMINED THAT THE CHILDREN WERE IN

730    NO IMMEDIATE DANGER OR ABUSE NEGLECT, OR ABANDONMENT NOR WERE THERE

731    ANY CONCERNS OF RISK TO REMOVE THE CHILDREN FROM THE FATHER'S CUSTODY . A

732    4TH   AND FINAL ATTEMPT AGAINST THE FATHER BEFORE THE APPELLANT AND HIS

733    CHILDREN WERE FINALLY MOVED TO A QUALITY MOTEL HOME2 SUITES BY HITON.

734    PURSUANT TO THE COMPLAINT OF THE BED BUG BITES  AND HAND FOOT AND

735    MOUTH VIRUS OF THE BABY, A 4TH  CPI INVESTIGATOR SHOWED UP AT THE MOTEL 6

736    MOTEL WHERE SHE INTERVIEWED THE CHILDREN TOOK PICTURES AND INTERVIEWED

737    THE FATHER AND IT WAS DETERMINED THAT THE CHILDREN WERE NOT AT RISK OF

738    ABUSE HARM OR NEGLECT THE CHILDREN   REMAINED IN THE CARE AND CUSTODY OF

739    THE FATHER UNTIL THEY WERE UNLAWFULLY REMOVED FROM THE FATHER. ON

740    AUGUST 10TH 2023 . MY SON WAS UNLAWFULL  REMOVED FROM HIS VERY FIRST DAY

741    OF SCHOOL .MY CHILDREN WERE UP TO DATE INTHIER IMUNZATIONS THERE WERE

742    MAJOR HEALTH CONCERNS OR ISSUES WITH MY CHILDREN, WE HAD 5 DAYS

743    EXTENDED TO US IN THE MOTEL BY FAMILY PROMISE.  WE WERE NOT HOMLESS

NEED TO WOORRY ABOUT HIM

744     **WHEN MY CHILDREN WERE UNLAWFULLU SEIZED BECAUSE I REFUSED AN**

745     **UNTIMATUM FROM NICOLE SLADE. MY CHILDREN WERE UNLWFUULY SEIZED 33 DAYS**

746     **AFTER DISQUALIFIED JUDGE KIRK VOLKER SIGNED THE REPORT RECOMENDANIONS**

747     **WHEREI WAS INCOMPLIANCE WERE THIS CASE WAS ON THE VERGE OF BEING CLOSED.**

748     **IT WAS ONLY EXTENDED DUE TO THE FACT THE  WE HAD NOT FOUND A 3 BEDROOM**

749     **OF MU SECTION 8 VOCHER.**

750

751

752     WHERE ALL THE ATTORNY ATTORNEY KNEW OF THE DELBERATE FALSEHOODS OF

753     THE SHELTER AFFIDAVIT  AND WAS AWARE OF THE FALSE MISLEADING **INNACCURATE**

754     **INFORMATION PROVIDED TO THEM BY CPI INVISTIGATOR ( BRIA** ATKINS) ACTING IN

755     CONCERT WITH **ANNIKA MCDONNALD** AND **NICOLE SLADE** OF CHILDNET WHERE I

756     MADE KNOWN IN COURT AND OUT SIDE OF COURT DURING THAT DCF WOULD NOT

757     MEET THE BURDEN TO PRESENT OR PROVIDE ANY PHYSICAL PROOF TO SUBSTANTIATE

758     THE DELBERATE FALSEHOODS  IN THE FALSE SHELTER AFFIFDAVIT TO ESTAB LISH

759     PROBABLE CAUSE OR TO SUBSTANTIATE  THE  DELBERATE FALSEHOODSTO PERSUE THIS

760     CASE YET THIS ATTORNRY PERSUED THIS CASE WITH RECKLESS DISREGARD OF THE

761     TRUTH.  I VEHEMETLELY MADE THE SAME ARGUMENT IN  A NELSON HEARING

762     TO REMOVE MY FORMER ATTORNEY JENIFFER MARSHALL  WHOS

763     CONDUCT IN CONCERT WITH DENISE  WEHIS

764
765

NEED TO WOORRY ABOUT HIM

- 766   Attorney misconduct where the attorney compromises a case" refers to a
767   situation where a lawyer settles a client's case without adequately informing
768   the client of the terms or potential risks, essentially giving away the client's
769   rights by agreeing to a settlement that is significantly below what could
770   have been achieved with proper representation, potentially violating ethical
771   standards and potentially constituting legal malpractice depending on the
772   circumstances.

  - 773   WHEREAS THE SHELTER HEARING ON AUGUST 15TH 2023  DID NOT
774   CONTINUE . I WAS DENIED AN OPPRTUNITY TO BE HEARED AND
775   DISPUTE ALL OF THE DELBERATE FALSEHOOS CONTAINED IN
776   THE SHELTER AFFIDAVIT . AS I WAS GIVIEN LEAVE BY
777   DISQUALIFIED JUDGE KIRK VOLKER TO REPRESENT MY SELF I
778   VEHMETLY MADE THIS ISSUE KNOWN AS I HAD A MEETING WITH
779   **ATTORNEY DENISE WE**HIS, ATTORNRY **JOSHUA  SMITH ( GAL)**
780   ATTTORNEY **KEVIN WALSH THE ATTORNEY JORGE ANTON**
781   **DELBERATLEY  WALK AWAY AS HE KNEW THAT HE SHOULD**
782   **NOT BE ASSIGNED BACK TO THIS CASE REPRESENTING MY**
783   **CHILDREN AS HE WAS ALREADY CALLED  OUT BY FORMER**
784   **ATTORNRY FOR THE MOTHER AT THAT TIME  SARAH**
785   **(CAMPBEL) WHERE MR ANTON WITHDREW HIMSELF FROM**
786   **THIS CASE EARLIER IN THE PROCEDDINGS 2 YEARS AGO AS**
787   **HE EXPRESSED HIS PERSONAL DIS LIKE OF THE ME. I HAD**
788   **VEHEMETLEY ASK MS MARSHALL TO FILE MOTION TO HAVE**

NEED TO WOORRY ABOUT HIM

789   **HIM REMOVED AS SHE REFUSED TO DO STATING "THAT IS**

790   **NOT SAYING ANYTHING, NO NEED TO WORRY ABOUT HIM**

791
792
793   ON DID INFACT CONTINUE TO PROSECUTE THIS CASE

794   `Yes, a lawyer who knows of deliberate falsehoods violates the Florida Bar's Code of
795   Professional Conduct, specifically Rule 4-3.3, which covers candor toward the tribunal:

796

797   A lawyer cannot knowingly offer evidence that they know is false. This includes failing
798   to correct a false statement previously made to the tribunal.

799 **Duty to disclose**

800   A lawyer must disclose) **False Evidence; Duty to Disclose.** A lawyer shall not
801   knowingly:**(1)** make a false statement of fact or law to a tribunal or fail to correct a false
802   statement of material fact or law previously made to the tribunal by the lawyer;**(2)** fail to disclose
803   a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or
804   fraudulent act by the client;**(3)** fail to disclose to the tribunal legal authority in the controlling
805   jurisdiction known to the lawyer to be directly adverse to the position of the client and not
806   disclosed by opposing counsel; or**(4)** offer evidence that the lawyer knows to be false. A lawyer
807   may not offer testimony that the lawyer knows to be false in the form of a narrative unless so
808   ordered by the tribunal. If a lawyer, the lawyer's client, or a witness called by the lawyer has
809   offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take
810   reasonable remedial measures including, if necessary, disclosure to the tribunal. A lawyer may
811   refuse to offer evidence that the lawyer reasonably believes is false.**(b) Criminal or Fraudulent**
812   **Conduct.** A lawyer who represents a client in an adjudicative proceeding and who knows that a
813   person intends to engage, is engaging, or has engaged in criminal or fraudulent conduct related to
814   the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the
815   tribunal.**(c) Ex Parte Proceedings.** In an ex parte proceeding a lawyer shall inform the tribunal
816   of all material facts known to the lawyer that will enable the tribunal to make an informed
817   decision, whether or not the facts are adverse.**(d) Extent of Lawyer's Duties.** The duties stated
818   in this rule continue beyond the conclusion of the proceeding and apply even if compliance
819   requires disclosure of information otherwise protected by rule 4-1.6.

820   *R. Regul. Fl. Bar 4-3.3*

821   Amended March 8, 1990 (557 So.2d 1368); July 23, 1992, effective 1/1/1993 (605 So.2d 252);
822   5/20/2004 (875 So.2d 448); 11/19/2009, effective 2/1/2010 (24 So.3d 63).
823   ***Comment***

824   *This rule governs the conduct of a lawyer who is representing a client in the proceedings of a*
825   *tribunal. See terminology for the definition of "tribunal." It also applies when the lawyer is*

NEED TO WOORRY ABOUT HIM

826 *representing a client in an ancillary proceeding conducted pursuant to the tribunal's*
827 *adjudicative authority, such as a deposition. Thus, for example, subdivision (a)(4) requires a*
828 *lawyer to take reasonable remedial measures if the lawyer comes to know that a client who is*
829 *testifying in a deposition has offered evidence that is false.*

830 *This rule sets forth the special duties of lawyers as officers of the court to avoid conduct that*
831 *undermines the integrity of the adjudicative process. A lawyer acting as an advocate in an*
832 *adjudicative proceeding has an obligation to present the client's case with persuasive force.*
833 *Performance of that duty while maintaining confidences of the client is qualified by the*
834 *advocate's duty of candor to the tribunal. Consequently, although a lawyer in an adversary*
835 *proceeding is not required to present a disinterested exposition of the law or to vouch for the*
836 *evidence submitted in a cause, the lawyer must not allow the tribunal to be misled by false*
837 *statements of law or fact or evidence that the lawyer knows to be false.*

838 *Lawyers who represent clients in alternative dispute resolution processes are governed by the*
839 *Rules of Professional Conduct. When the dispute resolution process takes place before a*
840 *tribunal, as in binding arbitration (see terminology), the lawyer's duty of candor is governed by*
841 *rule 4-3.3. Otherwise, the lawyer's duty of candor toward both the third-party neutral and other*
842 *parties is governed by rule 4-4.1.*

843 ***Representations by a lawyer***

844 *An advocate is responsible for pleadings and other documents prepared for litigation, but is*
845 *usually not required to have personal knowledge of matters asserted therein, for litigation*
846 *documents ordinarily present assertions by the client, or by someone on the client's behalf, and*
847 *not assertions by the lawyer. Compare rule 4-3.1. However, an assertion purporting to be on the*
848 *lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may*
849 *properly be made only when the lawyer knows the assertion is true or believes it to be true on the*
850 *basis of a reasonably diligent inquiry. There are circumstances where failure to make a*
851 *disclosure is the equivalent of an affirmative misrepresentation. The obligation prescribed in*
852 *rule 4-1.2(d) not to counsel a client to commit or assist the client in committing a fraud applies*
853 *in litigation. Regarding compliance with rule 4-1.2(d), see the comment to that rule. See also the*
854 *comment to rule 4-8.4(b).*

855 ***Misleading legal argument***

856 *Legal argument based on a knowingly false representation of law constitutes dishonesty toward*
857 *the tribunal. A lawyer is not required to make a disinterested exposition of the law, but must*
858 *recognize the existence of pertinent legal authorities. Furthermore, as stated in subdivision*
859 *(a)(3), an advocate has a duty to disclose directly adverse authority in the controlling*
860 *jurisdiction that has not been disclosed by the opposing party. The underlying concept is that*
861 *legal argument is a discussion seeking to determine the legal premises properly applicable to the*
862 *case.*

863 ***False evidence***

NEED TO WOORRY ABOUT HIM

864  *Subdivision (a)(4) requires that the lawyer refuse to offer evidence that the lawyer knows to be*
865  *false, regardless of the client's wishes. This duty is premised on the lawyer's obligation as an*
866  *officer of the court to prevent the trier of fact from being misled by false evidence. A lawyer does*
867  *not violate this rule if the lawyer offers the evidence for the purpose of establishing its falsity.*

868  *If a lawyer knows that the client intends to testify falsely or wants the lawyer to introduce false*
869  *evidence, the lawyer should seek to persuade the client that the evidence should not be offered. If*
870  *the persuasion is ineffective and the lawyer continues to represent the client, the lawyer must*
871  *refuse to offer the false evidence. If only a portion of a witness's testimony will be false, the*
872  *lawyer may call the witness to testify but may not elicit or otherwise permit the witness to present*
873  *the testimony that the lawyer knows is false.*

874  *The duties stated in this rule apply to all lawyers, including defense counsel in criminal cases.*

875  *The prohibition against offering false evidence only applies if the lawyer knows that the evidence*
876  *is false. A lawyer's reasonable belief that evidence is false does not preclude its presentation to*
877  *the trier of fact.*

878  *The rule generally recognized is that, if necessary to rectify the situation, an advocate must*
879  *disclose the existence of the client's deception to the court. Such a disclosure can result in grave*
880  *consequences to the client, including not only a sense of betrayal but also loss of the case and*
881  *perhaps a prosecution for perjury. But the alternative is that the lawyer cooperate in deceiving*
882  *the court, thereby subverting the truth-finding process that the adversary system is designed to*
883  *implement. See rule 4-1.2(d). Furthermore, unless it is clearly understood that the lawyer will*
884  *act upon the duty to disclose the existence of false evidence, the client can simply reject the*
885  *lawyer's advice to reveal the false evidence and insist that the lawyer keep silent. Thus, the client*
886  *could in effect coerce the lawyer into being a party to fraud on the court.*

887  ***Remedial measures***

888  *If perjured testimony or false evidence has been offered, the advocate's proper course ordinarily*
889  *is to remonstrate with the client confidentially if circumstances permit. In any case, the advocate*
890  *should ensure disclosure is made to the court. It is for the court then to determine what should be*
891  *done--making a statement about the matter to the trier of fact, ordering a mistrial, or perhaps*
892  *nothing. If the false testimony was that of the client, the client may controvert the lawyer's*
893  *version of their communication when the lawyer discloses the situation to the court. If there is an*
894  *issue whether the client has committed perjury, the lawyer cannot represent the client in*
895  *resolution of the issue and a mistrial may be unavoidable. An unscrupulous client might in this*
896  *way attempt to produce a series of mistrials and thus escape prosecution. However, a second*
897  *such encounter could be construed as a deliberate abuse of the right to counsel and as such a*
898  *waiver of the right to further representation. This commentary is not intended to address the*
899  *situation where a client or prospective client seeks legal advice specifically about a defense to a*
900  *charge of perjury where the lawyer did not represent the client at the time the client gave the*
901  *testimony giving rise to the charge.*

902  ***Refusing to offer proof believed to be false***

NEED TO WOORRY ABOUT HIM

903  *Although subdivision (a)(4) only prohibits a lawyer from offering evidence the lawyer knows to*
904  *be false, it permits the lawyer to refuse to offer testimony or other proof that the lawyer*
905  *reasonably believes is false. Offering such proof may reflect adversely on the lawyer's ability to*
906  *discriminate in the quality of evidence and thus impair the lawyer's effectiveness as an advocate.*

907  *A lawyer may not assist the client or any witness in offering false testimony or other false*
908  *evidence, nor may the lawyer permit the client or any other witness to testify falsely in the*
909  *narrative form unless ordered to do so by the tribunal. If a lawyer knows that the client intends*
910  *to commit perjury, the lawyer's first duty is to attempt to persuade the client to testify truthfully.*
911  *If the client still insists on committing perjury, the lawyer must threaten to disclose the client's*
912  *intent to commit perjury to the judge. If the threat of disclosure does not successfully persuade*
913  *the client to testify truthfully, the lawyer must disclose the fact that the client intends to lie to the*
914  *tribunal and, per 4-1.6, information sufficient to prevent the commission of the crime of perjury.*

915  *The lawyer's duty not to assist witnesses, including the lawyer's own client, in offering false*
916  *evidence stems from the Rules of Professional Conduct, Florida statutes, and caselaw.*

917  *Rule 4-1.2(d) prohibits the lawyer from assisting a client in conduct that the lawyer knows or*
918  *reasonably should know is criminal or fraudulent.*

919  *Rule 4-3.4(b) prohibits a lawyer from fabricating evidence or assisting a witness to testify*
920  *falsely.*

921  *Rule 4-8.4(a) prohibits the lawyer from violating the Rules of Professional Conduct or knowingly*
922  *assisting another to do so.*

923  *Rule 4-8.4(b) prohibits a lawyer from committing a criminal act that reflects adversely on the*
924  *lawyer's honesty, trustworthiness, or fitness as a lawyer.*

925  *Rule 4-8.4(c) prohibits a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or*
926  *misrepresentation.*

927  *Rule 4-8.4(d) prohibits a lawyer from engaging in conduct that is prejudicial to the*
928  *administration of justice.*

929  *Rule 4-1.6(b) requires a lawyer to reveal information to the extent the lawyer reasonably*
930  *believes necessary to prevent a client from committing a crime.*

931  *This rule, 4-3.3(a)(2), requires a lawyer to reveal a material fact to the tribunal when disclosure*
932  *is necessary to avoid assisting a criminal or fraudulent act by the client, and 4-3.3(a)(4)*
933  *prohibits a lawyer from offering false evidence and requires the lawyer to take reasonable*
934  *remedial measures when false material evidence has been offered.*

935  *Rule 4-1.16 prohibits a lawyer from representing a client if the representation will result in a*
936  *violation of the Rules of Professional Conduct or law and permits the lawyer to withdraw from*
937  *representation if the client persists in a course of action that the lawyer reasonably believes is*

NEED TO WOORRY ABOUT HIM

938 *criminal or fraudulent or repugnant or imprudent. Rule 4-1.16(c) recognizes that*
939 *notwithstanding good cause for terminating representation of a client, a lawyer is obliged to*
940 *continue representation if so ordered by a tribunal.*

941 *To permit or assist a client or other witness to testify falsely is prohibited by section 837.02,*
942 *Florida Statutes (1991), which makes perjury in an official proceeding a felony, and by*
943 *section 777.011, Florida Statutes (1991), which proscribes aiding, abetting, or counseling*
944 *commission of a felony.*

945 *Florida caselaw prohibits lawyers from presenting false testimony or evidence. Kneale v.*
946 *Williams, 30 So. 2d 284 (Fla. 1947), states that perpetration of a fraud is outside the scope of the*
947 *professional duty of an attorney and no privilege attaches to communication between an attorney*
948 *and a client with respect to transactions constituting the making of a false claim or the*
949 *perpetration of a fraud. Dodd v. The Florida Bar, 118 So. 2d 17 (Fla. 1960), reminds us that*
950 *"the courts are . . . dependent on members of the bar to . . . present the true facts of each cause . .*
951 *. to enable the judge or the jury to [decide the facts] to which the law may be applied. When an*
952 *attorney . . . allows false testimony . . . [the attorney] . . . makes it impossible for the scales [of*
953 *justice] to balance." See The Fla. Bar v. Agar, 394 So. 2d 405 (Fla. 1981), and The Fla. Bar v.*
954 *Simons, 391 So. 2d 684 (Fla. 1980).*

955

956 *(GAL )ATTORNEY KEVIN WALSH*

957     *1.  IN CONSPIRACY WITH DCF ATTORNEY  JOSHUA   SMITH ON DEC 16TH*

958     *2.  IN CONSPIRACY OF KNOWING OF THE DELBERATE FALSE HOODS IN*

959         *SHETER AFFIDAVIT AND FAILING TOTKAEACTION PURSUAN TOT HIS*

960         *DUTY TO DISCLOSE KNOWN VIOLATIONS OF OTHER ATTOR*

961     *3.  KNOWLEDGE OF THE FRAUAD ON THE COURT OF THE JUDICAL*

962         *MISCONDUCT AND MISREPRESENTATION OF THE MATERIAL FACTS BY*

963         *DISQUALIFIED JUDGE KIRK VOLKER*

964     *4.  FAULED TO TAKE ACTION AGAINST VOLUNTEER GARIAN AT LITEM*

965         *PEGGY WANGER PURSUANT TO:* **1ST  A** MALICIOUS ATTEMPT ACTING IN BAD

966         FAITH THE VOLUNTEER GUARDIAN AT LITEM FALSE ABUSE REPORT CALLED IN BY THE

967         FATHER OF WHICH THE CASE MANAGER NICOLE SLADE WAS AWARE , AND AVAILABLE

NEED TO WOORRY ABOUT HIM

968      **OF THE ISSUES FOR WHICH CHILD PROTECTIVE SERVICE ARRIVED TO THE APPELLANTS**

969      **APARTMENT WITH SEVERAL W.P.B POLICE OFFICERS THE INVESTIGATOR TOOK**

970      **PICTURES OF THE CHILDREN INTERVIEWED THE FATHER AND ADMINISTERED AN ON**

971      **SITE DRUG TEST TO THE FATHER WHICH WAS NEGATIVE. THE CPI INVESTIGATOR**

972      **DETERMINED THAT THE CHILDREN WERE IN NO IMMEDIATE RISK HARM OR DANGER**

973      **OF ABUSE OR NEGLECT THE CHILDREN REMAINED IN THE CARE OF THE APPELLANT**

974      **THE CASE WAS CLOSED 30 DAYS LATER.**

975      *5. CONSPIRACY TO DEPRIVATION AMD KNOWLWDGE OF DUE PROCESS*

976      *WHEERE THE SHELTER HEARING DID OT CONTINUE DUE TO THE FACT*

977      *THAT HE HAD HAD TO LEAVE THE HEARING AS ALLEGED BY HIM ON*

978      *COURT RECORD TO ATTENDEDTOT AMATTER CONCERNING HIS SON.*

979      *6. FAILD AND DEPRIVED LITTLE GIRL RGITH OF DUE PROCESS AFTER SEE*

980      *WAS PHYSICALL ABUSE BY THE FOSTER MOTHER SHE WAS NOT TKAEN*

981      *TO THE HOSPITAL , THE ISSUE WAS NOT RPORTED BY LAW ENFOREMENT*

982      7. **NOTICE OF FILING**

983      8. The State of Florida Department of Children and Families, by and through the

984      undersigned counsel, files this Notice of Filing for:

985      9. **DOCUMENT: ABUSE REPORT RE: RANDAL' ANTONIQUE**

986      10. **CERTIFICATE OF SERVICE**

987      11. I HEREBY CERTIFY that a true and correct copy of the foregoing was E-filed on

988      May 20, 2024 to:

989      12. Roberta Fenner, Attorney for the Mother

990      13. Randal Ferguson, Pro Se

991      14. Kevin Walsh, Attorney for the GALO

992      15. Jorge Anton, Attorney ad Litem

993      16. Anikee McDonald, Case Manager

994      17. */S/ Joshua Smith*

995      18. Joshua Smith, Esquire

996      19. Florida Bar Number: 0728128

997      20. Email: Joshua.Smith@myflfamilies.com

NEED TO WOORRY ABOUT HIM

43

998
999
1000
1001
1002

21. PHONE: 561- 837-5800
22. Children's Legal Services
23. Department of Children and Families
24. 111 South Sapodilla Avenue, Suite 307

25. West Palm Beach, FL 33401 1

Telephone Number – Home

1003    Telephone Number – Work
1004
26.                                                                    Telephone Number - Cell
**27. Narratives**

1005
1006    28.
1007    29. A. Allegation Narrative
1008    30.
1009    31. The child was recently placed in a new foster home as of 03/11/2024. Since being
1010    placed in that home the caregiver has hit her on the bottom of her feet with a flip
1011    flop and that it happened around 10 times and that it hurt. This past Saturday, the
1012    child repeated this during a sibling visit. The child is one of four siblings currently in
1013    licensed care. The child is placed in this home and her brothers are placed together
1014    in another foster home in Broward County.
1015    32.
1016    33.
1017    34.
1018    35.
1019    36.
1020    37.
1021    38. Pursuant to the instructions this complaint with the attached documents no more than 25
1022    pages non stabled
1023    39.
1024    40. Summited by Randal A, Ferguson 1673 w 28ᵗʰ street  Rivera Beach Florida fl, apt c1
1025    33404
1026    41. July 6ᵗʰ 2014
1027    42.

1028

1029    *ATTTORNEY JORGE ANTON*

1030    • *CONSPIACY WITH  ATTORNRY JOSHUA SMITH  GAL KEVIN WALSH*

NEED TO WOORRY ABOUT HIM

1031     • *CONFLICY OF INTREST KNOWINGINGLY DUE TO PERSONAL AND*

1032     *STATED DISLIKE OF THE FATHER SHOULD HAVE NEVER BEEN*

1033     *REASSIGNED OR ATTEMPT TO REPRESENT THE THE FATHERS MINOR*

1034     *CHILDREN AS HE HAS VIOLATED THEIR 6TH AMENDMENT RIGHT TO*

1035     *EFFECTIVE REPRESENTATIONS HE AS ALOWED DEPRIVATIONS AND*

1036     *CAUSED DEPRIVATIONS ACTING INCONSPIRACY WITH THE CIRCUIT*

1037     *JUDGES AND DCF AND GAL ATTORNRY 'S MIS REPRESENTING THE*

1038     *MINOR CHILDREN ACTING IN CONSPIRACY*

1039     • *HE WAS ASKED TO WHRDREWL HIM SELF FROM THIS CASE PRIOR*

1040     *BECAUSE OF MAKING KNOWN HIS DISLIKE OF THE FATHER*

1041     • *HIS PRESENCE HAS BEEN DETRAMENTAL TO THIS CAUSE TO THE*

1042     *MIOR CHILDREN  AND THE FATHER*

1043     • *HIS CONSPIRACY OF KNOWING OF THE FALSE SHELTER AFFIDAVIT*

1044     • *CONSPIRACY WITH THE JUDGE OF HIS "FRAUD ON THE COURTS OF*

1045     *THE SHELTR AFFIDVIT*

1046     • *CONAPIRACY TO UNAWFULLY PARTICIPATE AND VIOLATE THE*

1047     *FEDERAL REMOVAL STATUE DEPRIVING THE FATHER OF HIS 14TH*

1048     *AMENDMENT RIGHTS*

1049 *THE INJUSTICE BY THESE ATTORNRY'S AND ACTS OF PROFESSIONAL*

1050 *MISCONDUCT IS WITHOUT EXCUSE. THE FACT THAT THE FATHER IS NOT A  BAR*

1051 *MEMBER IN EXPOSING AND BRINGING CONCRETE EVIDENCE THAT IS ALSO*

1052 *CLEAR AND CONVINCING IS ENOUGH. . THE ISSUES HER ARE AMATTER OF LAW.*

1053 *THE FATHER DEMANDING THE IMMEDIATE SUSPENSION OF 1 YEAR OF THESE*

NEED TO WOORRY ABOUT HIM

1054  *ATTORNRY'S AND LINCENSE TO PRACTICE . THErE IS NO TELLING HOW MANY*

1055  *PARENTS HAVE BEEN VICTIMIZED BY THe CONDUCT OF THESE ATTORNIES.*

1056  *THE EVIDENCE AND ACTIONS THEY CANNOT DISPUTE THE FATHER  IS ALSO*

1057  *DEMANDING MONETARY SANCTIONS OF ATtORNY FEES OF 5,OOO FROM EACH*

1058  *ATTORNEY FOR EACH MINOR CHILD AS WELL AS THE FATHER, THE FATHER IS*

1059  *OPEN TO ENTERING INTO NEGOTATIONS IN LIEU OF  FURTHER PERSUIT  O*

1060  *FLEGAL REDRESS AND ACCOUNTABLE IN REWEVING OF THE EVIDENCE AND*

1061  *THE FALSEHOODS AND MISCARIAGES OF JUSTICE  INVOVEDED SURROUNDING*

1062  *THE UNLAWFULSEIZER OF HIS MINOR CHILDREN IN AN EFFORT TO RESTORE*

1063  *STABILITY TO THIS FAMILY AND BEGIN THE HEALING PROCESS OF THIS*

1064  *FAMILY T RE- BUILD ,*

1065  *THE FATHER IS OPEN TO  STABALIZING AND ORGANIZING AN EFFORT FOR AN*

1066  *STRESS FREE TRANSITION OF REUNIFICATION OF HIS CHILDREN ORDERING*

1067  *CHILD NET  TO  ASSIST IN PROVIDING ALL NECESSARY HOUSE HOLD NEEDS OF*

1068  *THE FAMULY  HOWEVER, THE FATHER WILL STILL SEEK  AND VEHEMETLEY*

1069  *CAMPAGIN HOLDING CHILDNET CPI INVESTGATOR  FOSTER PARENTS LIABLE*

1070  *FOR SUCH INJUSTICE IRREPERABLE HARM UPON HIMSELF AND HIS CHILDREN*

1071  *RESPECTFULLU SUBMITTED THIS 6TH DAY OF JANUARY 2025*

1072  *R andal . Ferguson rfergursonteach123@mailfence.com   contact infor dcf delagte Iiona*

1073  *gamble 561 273-3873*

1074

NEED TO WOORRY ABOUT HIM

61

**Defendants Exh # 2**

## LASTLEY, THESE CONCRETE FACTS THAT MUST NOT BE IGNORED !

- **1. A FALSE SHELTER AFFIDAVIT THAT FAILED TO MEET THE BURDEN TO ESTABLISH PROBABLE CAUSE PURSUANT TO: Pursuant to** *Fla R. Juv P 8.305 b (3)* states " *The issue of probable cause shall be determined in a non- adversarial manner applying the standard of proof necessary for an arrest warrant".*

  **HERIN IS A COPY OF THE SHALTER AFFIDAVIT FOLLOWED BY DEFEDANT (S) OUTLING ITEMS THAT DCAF AND CHILDNET HAS EVEN TO DAY FAILED TO PRODUCE.**

IN THE CIRCUIT COURT

OF THE FIFTEENTH JUDICIAL CIRCUIT

IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NUMBER / DIVISION **2019DP000789 / JL**

IN THE INTEREST OF

| | |
|---|---|
| ~~FERGUSON, LAVENDER ANTONIA~~ | ~~02/16/2017~~ |
| **FERGUSON, RANDAL ANTON JR.** | 07/08/2018 |
| **FERGUSON, RANDAL' ANTONIQUE** | 09/20/2019 |
| **FERGUSON, AVAN AMORE REGINALD** | 12/28/2020 |

Minor Children.

### DEPENDENCY SHELTER ORDER AND **NOTICE OF HEARING**

THIS CAUSE came to be heard on August 15, 2023, for a Probable Cause Hearing based upon the sworn petition filed by the State of Florida Department of Children and Families (hereinafter "Department"):

## Parties Present

1.        Present before the Court were:

A.      Attorney for the Department: Denise Weihs

B.      Child Protective Investigator: Bria Askins

C.      Attorney for Father: Jennifer Marshall

D.      Attorney for Guardian ad Litem:  Kevin Walsh

E.      Attorney ad Litem: Jorge Anton

F.      Case Manager: Nicole Slade

## Findings

2.      The Court has jurisdiction over the subject matter of this case.

3.      The children were found within the jurisdiction of this Court and are of an age subject to the jurisdiction of this Court.

4.      The children are residents of the State of Florida.

## Child Presence

5.      The children are not present because it is in the best interest of the children to conduct this Shelter Hearing without the presence of the children.

## Placement in Shelter

6. On August 10, 2023, the  children were taken into custody by the Petitioner, Child Protective Investigator, (hereinafter "CPI"). This Court must place the children in shelter at the request of the Petitioner for the reasons stated in this Order.

## Right to Counsel

7. The parent(s), guardian(s), or other legal custodian(s) are hereby informed of their right to be represented by an attorney at the Arraignment Hearing, case plan conference and at each and every stage and hearing of the dependency proceedings and of the right of an indigent person to be represented by court appointed counsel at this hearing and at all stages and future hearings in the dependency proceedings.

**Father – Appointment of Attorney**

A. The father is represented by counsel, Jennifer Marshall.

63

## Shelter Allegations

8.      The child is being sheltered based on allegations of abuse, neglect, or abandonment, or was in imminent danger of illness or injury as a result of abuse, neglect or abandonment.

9.      The allegations in the Shelter Petition are:

### A. **Abuse Report**

Abuse Report# 2023-206533 Received 6/28/2023.

It was reported the father has been driving with a suspended license. The father is currently on probation for child neglect. The father crashed his car with two of the children in the car and total the car. It was reported he was asleep at the wheel. It has been reported that he also fall asleep at the daycare of the baby, just signing the child out. The daycare provider had to wake him up to get the child and was concerned about him getting home. He had the other children with him. There was a previous report of him being asleep as the children roamed the house. There is a history of substance misuse for the father. There is a concern for the safety of the children in his care.

02- Received on 6/30/2023.

On 6/29/23, Law Enforcement was called out because the children were found outside unattended crying. The father left the children home alone. The mother made it back home before Law Enforcement arrived on scene. This is not the first time the father has left the children home alone. This has happened at least 3 - 4 times. In the past, the father was arrested for 3 counts of child neglect for leaving the children home alone. The children's approximate ages are 3, 4 and 5.

-03 Received on 6/30/2023.
The father left the children unattended last night at around 8:30. The father left the door to the apartment open, and the children were crying. They were in and out of the apartment. Law Enforcement was contacted. The father was seen running back to the apartment. Th father made it back as Law Enforcement arrived. The father leaves the children alone. He normally leaves them alone at night. The father uses profanity with the children. He has been heard yelling " get your m** f'ing asses out..". The mother is not allowed to be around the children.

-04 Received 7/15/2023
There is a concern for the children's safety and well-being due to the father "beating" them and because they are getting kicked out of the hotel they are currently residing in.

-05 Received 7/16/2023.
On 07/15/2023, someone called law enforcement to report that the father had hit two of the children. Video surveillance at the hotel showed the father slapping the hands of two of the children. It did not

rise to the level of abuse. It appeared to be a corporal punishment type of slap on the hands. The reporter was unsure which two children's hands were slapped.

The father stated that a DCF case worker set the family up in a hotel. The father is the sole caregiver to the children. He has been caring for the children for the past four years by himself. He is a having a very difficult time caring for the four young children. The hotel room was filthy. There were dirty clothes and dirty sheets all over the hotel room. There were roaches in the room. One of the children picked up a roach, and the father reported the roaches to the management. The father said he doesn't receive very much money for food assistance. He is already out of money for food, and the children need more food. The youngest children were wearing very heavily soiled diapers.

The father needs child care so that he can get a job to try to support the family. He is in need of further assistance. The mother is not involved in the lives of the children. There is an order against the mother stating that she is not allowed to see the children because she is on drugs.  The father has been charged with child neglect in the past.

-06 Received 7/23/2023.
Law enforcement were called to the hotel where the father is staying with his children. The hotel staff report seeing him beat his children in a way they described as abusive. It was reported he was yelling at them and hitting with an open hand and slammed on the children into a wall. The hotel staff attempted to intervene but was also threatened with violence. The father told the hotel staff "he will catch them outside." There is a concern for the children in his care. The father is being asked to leave and has no place to live with his 4 young children.

**B. Statement of Facts:**

This shelter consists of Open Dependency Case, 2019DP000789, and Related Open Dependency Case, 2022DP000587. The Department seeks to shelter the Children from their Father, based on allegations of abuse and neglect in this most recent investigation.

Child Protective Investigator (hereinafter, "CPI") initiated this instant investigation on August 10, 2023, after meeting with Case Management.

Case Management discovered two Facebook posts, dated, 06/16/2023 that reveals Father driving his car, falling asleep at the wheel, and totaling the car. The Father does not have a valid driver's license and was on probation at the time of the accident.

On June 27, 2023, the Guardian ad Litem visited the daycare for Zadius, the youngest Child, and spoke to the Theresa Daniels, the daycare owner. Ms. Daniels reported that about two weeks ago, the Father called  the daycare and stated that he could not pick up the child, as he was involved in an accident,  but he was having a male adult come to pick up the Child. When the adult male arrived, he reported to Ms.

Daniels that Father fell asleep at the wheel while Children, Randal Jr. and Anna (Randal' Antoniq), were in the car, and that the van was totaled.

Ms. Daniels also reported that the Father fell asleep filling out paperwork at the daycare. The Dependency Case Manager (hereinafter, "DCM") called Ms. Daniels to corroborate the concern. Ms. Daniels confirmed the DCM the same narrative she told the Guardian ad Litem, and Ms. Daniels further reported to DCM that she was concerned that day that the Father fell asleep filling out paperwork.

The Father submitted a request to end his lease early and moved out of his home on June 30, 2023. The Department had to put the father in a hotel, as he did not have other arrangements for a place for he and the Children to live.

The first hotel where the Father stayed with the Children was Extended Stay America. The DCM made visits to this hotel. The hotel room was observed as "in disarray" and in environmentally hazardous, filthy conditions. The Children were observed to be unclothed at times during the visits.  The Father reported that the Children were not clothed because the children "were all having diarrhea." Case Management offered services to the Father to support the needs of the Children, given the concerns for the Father being able to meet the Children's needs. The Father declined services, stating he will not engage in more services from the Department.  The Department made the following referrals as a result:

> The DCM completed a referral for SMART on 6/30/2023.

> The DCM completed a referral for the Parent Mentor Program on 7/14/2023.

> The DCM completed a referral for the TCM (targeted case management) services for the father and the children on 7/14/2023.

The Father's stay at Extended Stay ended 7/14/2023, and the hotel declined to extend his stay. The Father was moved to Inn Town Suites on 7/14/2023.

On 7/15/2023, the DCM received a call from Law Enforcement Officer, Sargent Schneider, who had been called to Inn Town Suites.  Sargent Schneider was at the Father's hotel room at the time he called. The Sargent expressed concerns for the Children's wellbeing and of the Father being incapable of caring for the vulnerable-aged Children. Sargent Schneider described the hotel room as "chaotic", and further reported that the Father had no food for the children. Sargent Schneider reported the Children as "unkempt."

On 7/23/2023, the Inn Town Suites Staff informed Case Management that they were going to evict the Father from the hotel premises.  The DCM spoke to Inn Town Suites hotel staff, Daniel, who reported that he observed the Father pushing the oldest child against a wall, and that the Father was yelling and

hitting the Child. Daniel states that the Father also made threats towards him. The hotel staff wanted to express their concerns for the Children.  Daniel stated that Mr. Ferguson needed to immediately leave the hotel.

During Home Visits over the past month-and-a-half, the Children have been observed by ChildNet Program Officer Nicole Slade, Director of Case Management, Anikee McDonald and DCM, Hillary Garcons. The several hotel rooms are observed in disarray, in extremely unhygienic and environmentally hazardous conditions. The Children are normally reported to be without clothing.

Furthermore, the Children have been observed to be smeared with feces on numerous accounts. The Father has been observed with a belt on the bed. The Father does not have the pack-n-play provided by the Department to ensure that no co-sleeping is taking place. The Father has continuously had to be provided food, clothing, baby formula, groceries and hotel stays to be able to provide the Children with basic shelter, food, and clothing needs. The home environment is entirely chaotic with no stable, secured housing. The Father continues to refuse additional services by the Department. The Father has been provided groceries on 7/6/2023; 7/18/2023; 7/20/2023 and 8/7/202. The Father has been provided diapers and pull ups weekly  and by multiple providers. At present, the Father does not have housing, and he is unable to meet the basic needs for the Children.

Adopt-A-Family reports they have been working with Father off-and-on over the past few years, since the Department became involved with the family.  Adopt-A-Family was supporting Father in finding appropriate housing. The Adopt-A-Family worker, Abbey Hartman, completed a visit to the hotel where Mr. Ferguson is currently residing with the Children. Ms. Hartman reported similar concerns for the condition of the hotel room: unsanitary conditions, lack of food observed in the room, the Children being naked, and the Children having diarrhea. Ms. Hartman also expressed concerns for the Father's ability to meet the Children's basic needs.  Ms. Hartman additionally observed Father yelling at the Children during this visit.

Dr. Mays from Family Promise met with the Father in her office in regards to the support they were providing that the Father declined. Family Promise offered the Father shelter housing in Lake Worth, and the Father declined but later returned with the Children to request the assistance again. Dr. Mays noted concerns for the Children, and observed the Children being unkempt. In particular, the baby had "bumps that appeared to have puss coming out of them".  Dr. Mays expressed overall concern for the Father's ability to care for his Children.

Case Management attempted to make doctor appointments for the Children, since it appeared the Children still had diarrhea after multiple weeks of symptoms, and the baby, Zadius, was wheezing. Pediatric Associates reported there had been several no show appointments with this family, and two of the Children are overdue for their wellness checks. Pediatric Associates reported that Randal Jr. had two recent no shows on May 1, 2023 and June 28, 2023. Anna has one no show on 7/25/2023. Pediatric Associates additionally reported that the Children, Avon, Randal Jr. and Anna are all due for wellness check appointments.

"pooped on himself", Randal Jr. denied it. When CPI was dropping Randal Jr. off to ChildNet, the Child smelled of both feces and body odor.

Sheltering the Children from the Father is warranted at this time due to the present danger threats and allegations of unstable housing, physical abuse, and neglect (including medical neglect).  Despite the concerns of numerous service providers, the Father refuses to engage in additional services to facilitate adequate care for the Children.  The Father's extreme neglect of the Children also denotes his little-to-no protective capacities for the vulnerable-aged Children.

    A. <u>Removal and Specific Acts</u>: The Statement of Facts above is incorporated as though fully set forth herein. The children are being removed today because:

    1. The specific acts as to FATHER of abuse / prospective abuse / imminent risk of abuse are: Physical abuse pursuant to Florida Statutes § 39.01(2) and §39.01(34)(a); leaving the children without appropriate adult supervision or arrangement appropriate for the children's age or mental or physical condition pursuant to §39.01(34)(a)(3); engaging in behavior that demonstrates a wanton disregard for the children's presence that could reasonably result in serious injury to the children pursuant to §39.01(34)(i), making a child unbailable for the purpose of impeding or avoiding a protective investigation, pursuant to §39.01(34)(l); and demonstrating a lack of protective capacities during an open dependency case pursuant to § 39.01(2).

    2. The specific acts as to FATHER of neglect / prospective neglect / imminent risk of neglect are: The Father has deprived the Children of necessary food, clothing, shelter, and medical treatment, and allowed the Children to live in an environment when such deprivation has caused the children's physical, mental, or emotional health to be significantly impaired or in danger of being significantly impaired, pursuant to § 39.01(34)(f); §39.01(47); and §39.01(50).

## Safety Planning  / Voluntary Services

10. Department was unable to provide services and/or safety planning to the mother/father/parents and none was/were required because the incidents causing removal of the children occurred during an emergency situation where present danger was identified. No in home present danger safety plan or safety management services could remedy the situation to prevent removal due to the events described in paragraph 13.

## AND

11. _X__ The Department attempted to provide services and/or a safety plan to the father, however, impending danger was subsequently identified and an in home safety plan is not able to be implemented at this time to keep the child in the home due to:

1. __X_The legal Father __X__ is not willing and has not demonstrated cooperation with all identified safety service providers.

2. _X_The home environment is not calm and consistent enough for an in-home Safety Plan to be implemented and for service providers to be in the home safely.

3. _X_Safety services are not available at a sufficient level and to the degree necessary in order to manage the way in which impending danger is manifested in the home.

4. _X_An in-home Safety Plan and the use of in-home services cannot sufficiently manage impending danger without the results of scheduled professional evaluations.

5. _X_The legal Father does not have a physical location in which to implement an in-home Safety Plan.

## Reasonable Efforts and Specific Services

12. A list of specific services and date available which could prevent or eliminate the need for removal or continued removal from the home are as follows: None available and none expected to become immediately available that would prevent or eliminate the need for this removal.

AND

13. The Department is deemed to have made **reasonable efforts** to prevent or eliminate the need for removal of the child and the provision of appropriate and available services will not eliminate the need for placement of the child in shelter care because:

A. _X___ an emergency existed in which the child could not safely remain in the home; a summary of the emergency is as follows: *See above section for detailed Shelter Allegations and Causes for Removal. A summary of the nature of the emergency is:_____.*

B. _X___ the home situation presents a substantial and immediate danger to the child's physical, mental, or emotional health or safety which cannot be mitigated by the provision of preventive services;

C. _X___ the child cannot safely remain in the home because there are no preventative services that can ensure the health and safety of the child;

D. __X__ even with appropriate and available services being provided, the health and safety of the child cannot be ensured; *list the services already provided and state why services did not remedy the situation:* SMART, Parent Mentoring Program, Targeted Case Management, Housing Assistance, Adopt-A-Family, and Family Promise.  Father Refused Services.

E. ____ the parent or legal custodian is alleged to have committed any of the acts listed as ground for expedited termination of parental rights in F.S.

39.806(1)(b)-(d) and (f)-(m), specifically:

_____

_____

_____

## Contrary to Welfare

14.     Continuation of the children in the home would be contrary to the welfare of the children because the home situation presents a substantial and immediate danger to the children's physical, mental, or emotional health or safety which cannot be mitigated by the provision of preventive services. The first contact with the Department occurred during an emergency, and the appraisal of the home situation indicated a substantial and immediate danger to the children which could not be mitigated by the provision of preventive services. Continuation of the children in the home would be contrary to the welfare of the children because, specifically, the conditions that led to the children's out of home placement  with respect to the  Father is: physical abuse, lack of protective capacities in an open dependency case, and neglect including medical neglect.

15.     The specific findings as grounds for removal and need for placement are incorporated as though fully set forth herein and support the Court's finding that continuation in the home is contrary to the welfare of the children.

## Cause of Removal

16. The conditions that led to the children's out of home placement were caused by the Mother and Father.

## Probable Cause-Grounds for Removal Pursuant to section 39.402(1)(a-c), Florida Statutes

17.     **A Probable Cause hearing did not take place as the Father withdrew him motion.**

18.     **THERE IS PROBABLE CAUSE** to believe that reasonable grounds for removal exist based on the allegations in the Verified Shelter Petition which are incorporated herein, the provision of appropriate and available services will not eliminate the need for placement, the children is dependent, and shelter care is necessary and in the best interest of the children because:

A.     _X__ The children have been abused, abandoned, or neglected or is in imminent danger of illness or injury as a result of abuse, abandonment or neglect;

B.     __The parent or legal custodian has materially violated a condition of placement imposed by the Court;

C.     _X_ The child has  no parent, legal custodian, or responsible adult relative immediately known and available to provide supervision and care.

## Sibling Placement

19. The Department has made reasonable efforts to keep siblings together after removal from the home.  The reasonable efforts of the Department included the request to case management placement specialists to keep siblings placed together whenever possible and in their best interest.

## Findings as to Father

20. The Court specifically finds that placement of the children with the Father would endanger the safety, wellbeing or physical, mental or emotional health of the children  because the Father abused and neglected the Children.

## It is ORDERED AND ADJUDGED

## Best Interest

21. Pursuant to sections 39.402(1)(a-c) and 39.402(2) Florida Statutes, continuation of the children  in the home is contrary to the welfare, and placement in shelter care is in the best interests because appraisal by the Department indicates that the home situation presents a substantial and immediate danger to the children 's physical, mental or emotional health or safety which cannot be mitigated by the provision of preventive services; or even with appropriate and available services, the safety of the children cannot be insured.

    A.   __**X**___the children were abandoned, neglected or abused or are suffering from or in imminent danger of injury or illness as a result of abandonment, neglect or abuse as described in the Petition allegations above;

    B.   _____the parent/custodian has materially violated a placement condition previously imposed by the Court.

    C.   __**X**_the child has no parent, legal custodian or responsible adult relative immediately known and available to provide supervision and care.

**Placement - The Department has made reasonable efforts to place the children in order of priority as provided in section 39.4021, Florida Statutes, or such priority placement is not a placement option or in the best interest of the children based on the criteria and factors set out in section 39.01375, Florida Statutes. The children shall remain/be placed in the shelter custody of the Department as follows:**

Placement – OUT OF HOME LICENSED CARE

22. __X___The children shall be placed in the shelter custody of **the Department in out of home licensed care** as there are no relatives/non relatives willing/able to take custody of the children at this time. **The Department shall have placement and care responsibility while the children is under protective supervision in an out of home placement**.

Potential Relative Placements / Identity and Location of Parent Unknown

23. At the Shelter Hearing, the Court inquired whether the parent(s) has/have relatives who might be considered as a placement for the children. The Court ordered the parent(s) to provide to the Court and all parties the identification and location information of the relatives. The parent(s) has/have a continuing duty to notify the Department of any relative who should be considered for placement of the children.

Mother Visitation-as previously ordered

24.     **MOTHER:** The frequency/nature of visitation/contact with the child is:

A.   ___**Supervised** visitation with the children. The visitation shall be supervised at all times by

__X___ DCF or DCF delegate (father not to be a delegate)

_____ DCF only

B.   The visitation shall occur on a schedule agreed by the parties and at a place agreed by the parties. The frequency of the visitation shall be: minimum of three times a week for two hours

C.   ____**No contact.** The Court finds by clear and convincing evidence that it is not in the best interest of the child for the Mother have contact with the child based on the finding of facts previously stated herein. Specifically,

_____

_____ D. ____

**Unsupervised.**

Father Visitation-to be addressed at the contested probable cause hearing

25.     **FATHER:** The frequency/nature of visitation/contact with the children is:

E.   __X__ **Supervised** visitation with the children. The visitation shall be supervised at all times by

    __X___ DCF or DCF delegate

    _____ DCF only

F. The visitation shall occur on a schedule agreed by the parties and at a place agreed by the parties.  The frequency of the visitation shall be: minimum of two (2) times a week for two (2) hours.

**Sibling Visitation**

26. __X___ Ongoing visitation/interaction between siblings is recommended.

## Travel /Support/ Medical

27. **Travel:** The Department, its authorized agent/authorized designee, and/or agency responsible for providing services to this family is hereby authorized to permit the adult custodian(s) permission to take the child  to another county within the State of Florida for no longer than seven (7) days and the adult custodian(s) is/are authorized through the Department, its authorized agent/authorized designee, and/or agency responsible for providing services to this family, to authorize emergency medical, surgical, and psychological/psychiatric evaluations and treatment of the child, if necessary, during any said trip. No person shall remove the child  from the State of Florida without a Court Order.  The adult custodian(s) must notify DCF, its authorized agent/authorized designee, and/or agency responsible for providing services to this family or its contract provider, in writing of their travel plans.

28. **Support:** The parent(s), guardian(s), or other legal custodian(s) of the child  **shall pay to the Department a fee for the child  care, support and maintenance pursuant to Florida Statute 39.402(11) so long as the child remains in shelter care.** The Payer of Social Security, Veterans Benefits, Child Support or other payments for or on behalf of the child  shall redirect those payments to the Department or the current custodian of the  child .  The parent(s) present at this hearing have been provided an Affidavit Regarding Public Benefits, Financial Affidavit, and Instructions for child support determination.

29. **Medical Examination:**  When a parent, legal custodian, or legal guardian is/is not available to consent to routine medical _examination_, notwithstanding a reasonable effort to obtain such consent, a legal custodian appointed in these proceedings, or in the absence of such a legal custodian, the Department, its community based care contracted agents, including shelter/foster parents, or the person primarily responsible for the care management of the child, is hereby authorized to consent to the ordinary and necessary medical, dental, and psychological examination of the child, including blood testing, HIV testing, preventative care, tuberculin testing and well-child care without further court order. Any such custodian/caregiver shall be responsible for transportation of the child  to any medical appointment, including the medical EPSDT screening that shall occur within 72 hours of removal. Providers/facilities may require identification and a signature to ensure compliance with applicable state and federal law.

30. **Medical Treatment:** Medical _treatment_ including the need for **_immunization, surgery, general anesthesia, provision of psychotropic medications, or other extraordinary medical procedures requires informed parental consent or a separate order._**  Pursuant to Florida Statute 39.407(2), when the Department has performed the EPSDT medical screening authorized by subsection (1), or when it is otherwise determined by a licensed health care professional that a child who is in an out-of-home

placement, but who has not been committed to the department, is in need of medical <u>treatment</u>, including the need for immunization, consent for medical treatment shall be obtained from a parent or legal custodian of the child or a court order unless the situation meets the definition of an emergency in Florida Statute <u>743.064</u> or the treatment needed is related to suspected abuse, abandonment, or neglect of the child by a parent, caregiver, or legal custodian. In such case, the Department shall have the authority to consent to necessary medical <u>treatment</u>.

This authority is limited to the time reasonably necessary to obtain court authorization.

## Psychotropic Medications - None Prescribed

31. __X___ **NO** psychotropic medication are prescribed for the children which the Department and/or designee were advised at the time of this Petition. Inquiry was made of the parents unless unavailable prior to filing this petition.

## Records

32.     Child's Records: The Department, its authorized agent/authorized designee, and/or agency responsible for providing services to this family is hereby authorized to obtain records regarding the above-named child  medical, behavioral health and educational background so that a Comprehensive Behavioral Health Assessment may be conducted for the purposes of accomplishing permanency planning for the above-named child . Any and all medial, behavioral health and educational records pertaining to the child  shall be released to the Department, its authorized agent/authorized designee, and/or the agency responsible for providing services to this family so that a Comprehensive Behavioral Health Assessment may be conducted for the abovenamed child . The Department of Children and Families, its authorized agent/authorized designee, and/or agency responsible for providing services to this family is hereby authorized to conduct a Comprehensive Behavioral Assessment as defined in 39.01(17), Florida Statutes. If the child is enrolled in early education/day care, then, pursuant to the Rilya Wilson Act, all parties must comply with Department's requirements as outlined in current operating procedures. It is in the child's best interests that all educational and medical records be released. **However, records containing the name(s), address and phone numbers of  the out of home licensed care custodian(s), the child's bus route/location, and person(s) designated by this custodian(s) to transport the child to and from school may not be disclosed by the child's school without court order.**

**Medical and Psychiatric Information and Records:**

33.     The parents, legal custodians/legal guardians, or other caregivers, as applicable, shall provide the Department, its authorized agent/authorized designee, and/or agency responsible for providing services to this family with all known information on the medical care and history of the child including mental/behavioral health treatment, and substance abuse treatment records, including the names of all current and former medical and mental health providers of the child, within 24 hours of this Order, and shall execute appropriate authorizations to release the child's medical information and records and mental/behavioral health treatment, and substance abuse treatment records.

34.     Upon presentation of a copy of this order, a legal custodian appointed in these proceedings, or in the absence of such a legal custodian, the Department, its authorized agent/authorized designee, and/or agency responsible for providing services to this family, including shelter/foster parents, or the person primarily responsible for the case management of the child, is hereby authorized to obtain copies

75

of the child's medical records and mental/behavioral health treatment, and substance abuse treatment records from any entity, including but not limited to, public and private health care providers and facilities, and may execute appropriate authorizations to release the child's medical information and records. Providers and facilities may require identification and signature to ensure compliance with state and federal medical records laws.

## Indian Child Welfare Act (ICWA)
35. Inquiry has been made pursuant to ICWA and the appropriate tribe, has been notified, if applicable. Tribe: **N/A**.

## Permanent Mailing Address
36.     The parties have provided the court with a permanent mailing address and said address will be used by the court and the petitioner for notice purposes unless and until the party notifies the court and the petitioner in writing of a new mailing address pursuant to F.S. 39.402. The parents are REQUIRED to advise the court and the Department or its authorized agent/authorized designee, and/or agency responsible for providing services to this family of any change of address within 72 hours.

## NOTICE TO PARENTS:

## Case Plan / Termination of Parental Rights and Private Adoption Plan

37.     **THE PARENT(S) MUST TAKE ACTION TO COMPLY WITH THE CASE PLAN SO PERMANENCY CAN OCCUR WITHIN THE SHORTEST TIME POSSIBLE.**

38.     **THE PARENT(S) MUST STAY IN CONTACT WITH THEIR ATTORNEY AND THE CASE MANAGER.**

39.     **THE PARENT(S) MUST PROVIDE UPDATED CONTACT INFORMATION IF THERE IS A CHANGE TO THE ADDRESS, PHONE NUMBER OR EMAIL ADDRESS.**

40.     **THE PARENT(S) MUST NOTIFY THE PARTIES AND THE COURT OF BARRIERS TO COMPETING THE CASE PLAN WITHIN A REASONABLE TIME OF DISCOVERING THE BARRIER.**

41. **THE COURT ADVISED IF THE PARENT(S) FAIL TO SUBSTANTIALLY COMPLY WITH THE CASE PLAN, THE PARENTAL RIGHTS MAY BE TERMINATED AND THE OUT-OF-HOME PLACEMENT OF THE CHILD MAY BECOME PERMANENT.**

42.     The parent is/parents are hereby notified of the right to participate in a private adoption plan and the availability of private placements of the child/children with an adoption entity as defined in Chapter 63, Florida Statutes. If a parent executes a consent for adoption of a minor with an adoption entity or qualified prospective adoptive parents and the requirements of §63.082(6) Florida Statues are satisfied, the Court will determine whether the best interests of the child are served by transferring the custody of the child to the prospective adoptive parent selected by the parent or the adoption entity by considering and weighing all relevant factors, including, but not limited to:

1. The permanency offered;
2. The established bonded relationship between the child and the current caregiver in any potential adoptive home in which the child has been residing;
3. The stability of the potential adoptive home in which the child has been residing as well as the desirability of maintaining continuity of placement;
4. The importance of maintaining sibling relationships, if possible;
5. The reasonable preferences and wishes of the child, if the court deems the child to be of sufficient maturity, understanding, and experience to express a preference;
6. Whether a petition for termination of parental rights has been filed pursuant to §39.806(1)(f), (g), or (h) Florida Statutes;
7. What is best for the child; and
8. The right of the parent(s) to determine an appropriate placement for the child.

Active Participation of Parents/Relatives/Custodians

43. The Court has notified the parents, relatives that are providing out-of-home care for the child or legal custodians of the time, date and location of the next dependency hearing and of the importance of the active participation of the parents, relatives that are providing out of home care for the child, or legal custodians in all proceedings and hearings. F.S. 39.402(8) (h) 6.

Attend Hearings/Submit Reports to the Court

44. The Court notified relatives who are providing out-of-home care for a child as a result of the shelter petition being granted that they have the right to attend all subsequent hearings, to submit reports to the Court, and to speak to the Court regarding the child, if they so desire. F.S.

39.402(8) (h) 8.

## Missing Child

45. The custodian(s) of any child subject to the jurisdiction of this court is/are hereby directed to notify local law enforcement, the Department of Children and Families, and the community based care agency immediately at any time that the child is determined to be missing or that the child's whereabouts are unknown.

## Notice of Change of Location of Child

46.  The custodian (parent or parents, relatives/non relatives, foster parents) providing  care for the child who have custody pursuant to this Order must notify the case manager within two (2) days of any changes with regards to where the child resides, attends school or daycare, or any other changes in the child's location of care.  The custodian is prohibited from removing the child from the court's judicial circuit without prior approval of the court and entry of an order authorizing them to do so.  Should the custodian fail to comply with these requirements or the child become unable to be located, the Department may, at the Department's discretion, notify local law enforcement and submit a missing child report.  This language is designed to allow law enforcement to proceed with all missing child protocols including the commencement of a complete investigation.

47.  In the event that a disaster or state of emergency is declared for the county where the child is placed, the caregiver may evacuate the child to a safe and temporary place anywhere within the continental United States without further order of the Court.  The caregiver shall notify the Department or its contract provider of the address and phone number of the safe place where the child will be located within 72 hours of the evacuation.  The Department shall make reasonable efforts to ensure that daily contact is made with their staff to report on the location of the child and the families and report to the Court. Within 24 hours of relocation or notification from the caregiver, the Department must notify the Court of the location of the child  and that the child has been placed under appropriate supervision and is safe. The caregiver shall return the child to the county of placement as soon as it is safe and suitable. The child  shall be returned to the  original placement as soon as it is determined that it is safe and suitable. Notice of the child 's return shall be given to the Court. A hearing may be set by the Court as soon as the emergency situation abates at which the Department shall notify the location of any child who has not been returned to the  original placements.

## Comprehensive Behavioral Health Assessment (CBHA)

48. _____ CBHA not applicable.  __X___ In accordance with section 39.407, a CBHA shall be completed. The Department or its contracted agencies shall be, provided with a copy of the CBHA within reasonable time.

## Early Steps Evaluation

49.  It is hereby ordered that an Early Steps Evaluation be provided to all eligible children (ages 0-3 years).  The referral must be made within 5 days of this Order.  The Department must provide access to available documents, for the purposes of this evaluation.  The release of such information is not prohibited by HIPAA for the purpose of providing diagnostic/treatment information.  The written report or family support plan must be provided within 60 days of this Court's order. The case manager will

provide a copy of the CBHA immediately upon receipt and a copy of or access to all additional available documents / evaluations as requested. Early Steps phone: 561-840-6109; fax: 561-881-0972.

50.     Retention of Jurisdiction: This Court retains jurisdiction over this matter to enter any order deemed to be in the child's best interest and welfare.

## NOTICE OF HEARING

51.     The Juvenile Court hereby gives Notice of Hearing for the following hearings -  date, time ( *or as soon thereafter as counsel can be heard*) and location:

**Judicial Review Hearing:**

52.     There is a **Judicial Review Hearing** on September 21, 2023 at 10:00 a.m.

A.     ___X_ Palm Beach County Courthouse, Juvenile Annex, 205 North Dixie Highway, West Palm Beach, FL, 33401, before a Magistrate in Room

3.1117 or Room 3.1120.

## Retention of Jurisdiction

53.     The Court retains jurisdiction over this matter to enter any other and further orders as may be deemed to be in the best interest and welfare of the children.

**DONE and ORDERED** on August 15, 2023 in West Palm Beach, Palm Beach County, Florida.

502019DP000789XXXXMB    08/24/2023
Kirk C. Volker   Circuit Judge

502019DP000789XXXXMB    08/24/2023
Kirk C. Volker
Circuit Judge

Copies to:

Denise Weihs, Attorney for DCF State of Florida CLS

Roberta Fenner, Attorney for Mother (robertafenner@gmail.com)

Jennifer Marshall, Attorney for Father (jennifermarshallpa@gmail.com)

Kevin Walsh, Attorney for the Guardian ad Litem (kevin.walsh@gal.fl.gov) e-file.JL@gal.fl.gov Jorge Anton, Attorney ad Litem (Janton@legalaidpbc.org)

ADA NOTICE

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator in the Administrative Office of the Court, Palm Beach County Courthouse, 205 North Dixie Highway, Room 5.2500, West Palm Beach, Florida, 33401; phone (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.

Si w yon moun ki gen yon enfimite e ki bezwen chanjman pou ka patisipe nan pwosede sa, konnen ou gen dwa, san w pa peye anyen, resevwa pwovizyon pou kèk èd. Rele tanpri ADA Coordinator a nan biwo Administrative Office of the Court, Palm Beach County Courthouse, 205 North Dixie Highway, Room 5.2500, West Palm Beach, Florida, 33401; telefòn (561) 355-4380 e se pou w rele li omwen 7 jou anvan dat ou sipoze ale nan tribinal la osnon rele li touswit depi ou resevwa lèt sa a depi gen mwens pase 7 jou anvan dant ou sipoze ale nan tribinal la; si ou gen difikilte pou tande oubyen pou pale, alò rele 711.

Si usted es una persona con alguna discapacidad que necesita algún tipo de adaptación funcional para poder participar en este procedimiento, usted tiene derecho, sin costo alguno, a recibir cierta ayuda. Favor contactarse con el Coordinador de ADA en la oficina administrativa del tribunal, que es el Tribunal del Condado de Palm Beach, 205 North Dixie Highway, Sala 5.2500, West Palm Beach, Florida, 33401; teléfono (561) 355-4380 por lo menos 7 días antes de su audiencia en el tribunal, o inmediatamente que reciba este aviso si

80

*Defendants Exhibit # 3*

la fecha antes de su audiencia es anterior a 7 días; si Ud. tiene problemas de audición o impedimento de voz, llamar al 711.

## FATHERS MOTION TO COMPEL TO PRODUCE

### IN THE 15TH JUDICAL CIRCUIT COURT IN AND FOR PALM BEACH COUNT YFLORIDA

Randal A. Ferguson ( Sui Juris)          Case # 2019DP000789/ J0

        Father          Case # 2022DPOOO587/JO

IN THE INTREST OF HIS MINOR CHILDREN

R.A.F JR.

R'A J F

A'A F

Z.P

-------------------------------------------------------------------------------- ----------- -

**FATTHER'S DEMAND AND MOTION TO COMPEL PURSUANT TO FLORIDA RULE OF JUV, P 8.245 (B) FOR THE DEPARTMENT OF CHILDREN AND FAMILES TO PRODUCE THE FOLLOWING FOR INSPECTION TO BE USED IN DEFENSE AND DISPUTE THEROF OF THE INCULPATORY EVIDENCE AGAINST THE DEPARTMENT OF CHILDREN AND FAMILIES IN DISPUTE OF FIRST, THE UNLAWFUL , UNSUBSTANTIATATE , BASELESS CLAIMS OF ALL THE ALLEGATIONS CONTAINED IN THE SHELTER AFFIDAVIT CONTAINING FALSE MISLEADING INNACCURATE INFROMATION WITH OMMISSION OF MATERAL FAC T THAT WERE NEVER PROVEN EVEN FOR WHICH THIS JUDICAL MACHINERY (RAN BY STATE AGENTS ), LACKS JURISDICTION, AND LEGAL STANDING, DUE TO STATE ACTORS IEVEN IN THEIR CONPIRACIES**

**, THE STATE AGENTS FAILED TO PROPERLY ESTABLISH A PRIMA FACIA CASE TO WHERE THE ENTIRE PROCCEDDING OF THIS MACHINERY BEING CONTROLED RAN AND OPERATED BY THE STATE AGENTS IN ACTS OF FRAUD , CONSPRACY AGENTS THE RIGHTS AND CRIMES OF THE CONSTITUTION OF THE STATE OF FLORIDA AND U.S. CONSTITUTION BEGINNING WITH THE UNLAWFUL INTRUSION , INTERFERANCE, INVASION OF PRIVACY BY CPI INVESTIGATOR(S ) AND CHILD NET , TO SUCH THAT SUCH CONPIRACIES INVOLVING THE DISQUALIFIED JUDGE KIRK VOLKER DCF ATTORNEY'S AND THE PRIVATE AGENCY OF CHILD NET ACTING IN CONCERT AND THEIR EMPLOYEES ARE IN DIRECT VIOLATION OF THE CONSTITUTIONAL RIGHTS OF THE STATE OF FLORDA OF THE FATHER AND HIS MNOR CHILDREN AND TREASON AGAINST THE U.S CONSTITUTON AND THE FEDERALLY PROTECTED PARENTAL RIGHT(S) OF THE FATHER AND HIS MINOR CHILDREN THAT WERE UNLAWFULLY SEIZED AND REMOVED**

1. THE FATHER DEMANDS AND COMPELS THE DEPARTMENT TO PRODUCE FOR PRODUCTION OF EVIDENCE A COPY OF THE DEPARTMENTS APPROVED SAFTY PLAN OF THE FATHER.2

2. THE FATHER DEMANDS AND COMPELS CHILDNET AND THE DEPARTMENT TO PRODUCE FOR PRODUCTION FOR EVIDENCE WRITTEN DOCUMENTATION OF THE ACTION , RECOMMENDATION TAKEN BY EACH SEPARATE ENITYTY PURSUANT TO EACH SEPARATE DATE AND ABUSE REPORT.

3 . FATHER COMPELS AND DEMANDS A SEPARATE COPY OF EACH ALLEGED ABUSE REPORT. EACH SEPARATE REPORT MUST BE ABLE TO VERIFY THE SPECIFIC DATE AND

TIME THE REPORT WAS FILED THE INDIVIDUL OR AGENCY THAT FILED THE REPORT AND TO WHOM THE REPORT WAS FILED TO. THE NAME OF THE INDIVIDUAL CAN BE DEDACTED THAT FILED THE REPORT . STARTING WITH THE DATE OF Abuse Report# 2023-206533 Received 6/28/2023. T TO BE PRODUCED FOR PRODUCTION OF EVEIDENCE

4. FATHER DEMANDS AND COMPELS DCF TO PRODUCE FOR PRODUCTION  FOR EVIDENCE  ALL FILED AND DOCUMENTED  REPORT(S)  OF ALL OF THE FOLLOWING CPI INVESTIATORS (RICHE BELAIR, CASSEY HENN, BRIIA ASKINS, PAULA ARCE, SABRINA ADOLPHIN KARA FASO, CESCILY QUINN, TERESA DUDEK, JESSICA MASSENGIL)

5. FATHER COMPELS AND  DEMANDS A SEPARATE COPY OF ALL  OF THE ALLEGED ABUSE REPORTS THAT WERE FILED  TO THE COURTS  FOR THE HEARING  DATED ON AUGUST 15TH 2023  *TO BE PRODUCE FOR PRODUCTION OF EVIDENCE*

6. FATHER COMPELS AND  DEMANDS  A  LETTER OR STATEMENT OF EACH OPPOSING COUNSEL PRESENT  IN THE  SHELTER  HEARING  DATE ON AGUST 15TH  TO BE PRODUCED FOR PRODUCTION OF EVIDENCE.

7. FATHER COMPELS AND  DEMNADS THAT THE DEPARTMENT PRODUCE  FOR THE COURTS  THE  FINAL OUTCOME AND RULING CONCERNING  THE ISSUE OF PROBATION OF THE FATHER AS ALLEDED IN Abuse Report# 2023-206533 Received 6/28/2023 TO BE PRODUCED FOR PRODUCTION OF EVIDENCE

8. FATHER DEMANDS AND  COMPESL THE DEPARTMENT TO PRODUCE FOR PRODUCTION OF EVIDENCE  A  COPY OF THE  CAR ACCIDENT  AS ALLEGED  IN Abuse Report# 2023-206533 Received 6/28/2023.

83

9.  **FATHER DEMNADS AND COMPELS THE DEPARTMENT TO PRODUCE FOR PRODUCTION OF EVIDENCE  A REPORT SHOWING  AN ARREST OF THE FATHER DURING THE TIME AND SPECIFIC LLY ON THE DATE ALLEGED OF  THE A FATHER DRIVING WHILE LICENSE SUSPENDED, CAUSING A ACCIDENT  AND TOTALING A CAR  AS ALLEGED IN ABUSE REPORT** Abuse Report# 2023-206533 Received 6/28/2023.

10. **FATHER DEMANDS AND COMPELS THE DEPARTMENT  TO PRODUCE FOR PRODUCTION  FOR  EVIDENCE  THE REPORT  DATING THE TIME IT WAS FILED THE DAY,  AND THE DATE OF THE  ALLEGATION AGAINST THE  FATHER " FALLING ASLEEP AT THE WHEEL" AS ALLEGED IN** Abuse Report# 2023-206533 Received 6/28/2023

11. **FATHER DEMANDS AND COMPELS THE DEPARTMENT TO PRODUCE FOR PRODUCTION OF EVIDENCE  THE RESPONSE AND ACTION TAKEN BY THE DEPARTMENT  PURSUANT TO THE ALLEGATION**  The father crashed his car with two of the children in the car and total the car AS ALLEGED IN Abuse Report# 2023-206533 Received 6/28/2023

13. **FATHER DEMANDS AND COMPELS THE DEPARTMENT TO PRODUCE FOR PRODUCTION OF EVIDENCE, A DOCUMENTED NOTERIZED   STATEMENRT OF THE DAYCARE WORKER** It has been reported that he also fall asleep at the daycare of the baby, just signing the child out. The daycare provider had to wake him up to get the

child and was concerned about him getting home AS ALLEGED IN Abuse Report# 2023-206533 Received 6/28/2023.

14. THE FATHER COMPELS AND DEMANDS  THE DEPARTMENT TO PRODUCE FOR PRODUCTION OF EVIDENCE  THE WRITTEN  RECOMMENDATION AND ACTION TAKEN BY  THE DEPARTMENT PURSUANT TO THE ALLEGED CONCERN AND SAFTY OF THE FATHERS  CHILDREN AS  ALLEGED  IN Abuse Report# 2023-206533 Received 6/28/2023.

15. FATHER DEMNADS AND COMPELS THE DEPARTMENT TO PRODUCE FOR PRODUCTION THE OUTCOME, AND THE  ACTION TAKEN BY DEPARTMENT PURSUANT TO THE ALLEGED  ABUSE REPORT FILED  ON 02- Received on 6/30/2023.  On 6/29/23

16. FATHER DEMANDS THE REPORT OF THE  CASE WORKER AS TO WHY THE CHILDREN WERE NOT IMMEDIAATLEY REMOVED  : PURSUANT TO THE ALLEGATION OF 6/30/2023  WHEREAS  THE ALLEGATION ALLEGES  AN UN SUPWERVISED CONTACT WITH THE MOTHER , FOR  WHICH THE BREACH DEMANDED IMMEDIATE REMOVAL OF THE FATHER CHILDREN DUE TO THE FATHER  ALLEDGELLY VIOLATING THE SAFTEY PLAN  WHEREAS IT WOULD SUBSTANTIATE THE ABILITY OF THE FATHER TO EFFETIVELEY PARENT  AND CLEARLY PUTTING  HIS CHILDREN AT RISK OF  DANGER AND HARM.

17. FATHER DEMANDS  PROOF OF CHILDNET JURISDICTION PURSUANT TO STATUE CH 39 THAT GIVES THE NON PROFFIT AGAENCY JURIDDICTION  OVER THE FATHER AND HIS MNOR CHILDREN

18. FATHER  DEMANDS/COMPELS DCF TOPRODUCE  FOR INSPECTION OUTLING  IN DETAIL THE  RESPONSIBILITY AND DUTY OF THE EMPLOYES OF CHILDNET PURSUANT TO THE CONTRACT BETWEEN THE STATE AGENT DCF AND THE PRIVATE ENTITY CHILDNET.

19. FATHER DEMANDS/ COMPELS DCF TO PRODUCE FOR   PRODUCTION OF THE FACEBOOK PAGE ALLEGED BY CASE Management  DATED 06/16/2023 " THAT REVEALS FATHER DRIVING HIS CAR. FALLLING TO SLEEP AT THE WHEEL, AND TOTALING THE CAR. THE FATHER DOES NOT HAVE A VALID DRIVER'S LICENSE AND WAS ON PROBATION AT THE TIME.

20. FATHER DEMANDS /COMPELS DCF TO  PRODUCE FOR INSPECTION A COPY OF THE FINAL RESULTS OF THE PROBATIONARY PERIOD OF THE FATHER.

21. FATHER DEMANDS/COMPELS  DCF TO PRODUCE FOR INSPECTION THE POLICE OR A CIDENT REPORT AS ALLELED PURSUAN TTO THE 06/16/2023 WHERE THE FACTULA STATEMENT OF MATERIAL FACT ALLEGES THE FATHER TOTALLING HIS CAR"

22. FATHER DEMANDS/COMPELS  DCF TO PRODUCE FOR INSPECTION THE  REPORT DATED JUNE 27TH 203  (1)  A POLICE REPORT IN REFERENCE TO SUCH INCIDENT (2) AN ACCIDENT  REPORT TO SUCH INCIDENT  (3)  A INCIDENT REPORT OF DCF (4)  A SIGNED  WITNESS STATEMENT OF OATH PERTAINGING TO ALLEGATION

<u>MADE BY THE DAYCARE   (5) A SIGNED STATEMENT OF OATH OF THE</u>

<u>ALLEGATION OF A ADULT MALE VERIFYING HIS IDENTITY  AND HIS STATEMENT.</u>

, (6)  A POLICE OR INCIDENT  REPORT THAT WHERE THE FATHER WAS

INVOLVED IN AN ACCIDENT  WHICH STATES THAT RANDAL JR AND RANDAL' 23.

ANTONIQUE WAS IN THE CAR AND THE VAN TOTALLED.

23. FATHER DEMANDS AND COMPELS DCF TO PRODUCE FOR INSPECTION TO BE

USED FOR EVIDENCE  THE OUTCOME OF  ALLEGED  ABUSE REPORT  RECEIVED

7/23/2023

24. FATHER DEMANDS AND COMPELS DCF TO PRODUCE FOR PRODUCTION OF

EVIDENCE.   ANOUTLINE OF DUITES , JOB DESCRIPTION, STANDARD OF

PROCEDURES OF THE PRIVATE AGENCY CHILDNET

25. FATHER DEMANDS AND COMPELS DCF  TO PRODUCE FOR PRODUCTION OF

EVIDENCE THE STATUE/ LAW.  (AS A MATTER OF LAW) JURISDICTION AND

LEGAL STANDING  GIVEN TO   THE PRIVATE AGENCY  CHILDNET PURSUANT TO

FL STATUTUE  39  OR FL STATUTE 409.174  AND  BY THE STATE OF FLORIDA

MANDATORY DUDY OF PARENTS  UNDER PENALTY OF TERMINATION OF

PARENTAL RIGHTS  IF PARENTS DO NOT COMPLY WITH ANY AND ALL REQUEST

AND RECOMMENDATIONS PROVIDED BY CHILDNET AND RECOMMENDED TO

THE DEPARTMENT WHEREAS THE DEPARTMENT ITSELF ONLY AGRESS TO

WHAT THE THE PRIVATE NON PROFITT 501 © 3 ENTITY RECOMENDS.  CHILD

NET,

26. 39) "Institutional child abuse or neglect" means situations of known or suspected child abuse or neglect in which the person allegedly perpetrating the child abuse or neglect is an employee of a public or private school, public or private day care center, residential home, institution, facility, or agency or any other ...

**WHEREFORE PUSUANT TO THESE ITEMS FATHER DEMANDS PRODUCTION OF SUCH TO PRESENTD TO THE FATHER AND THE COURT FOR PRODUCTION TO BE USED AS EVIDENCE IN DEFENSE OF THE FATHER LATER THAN SEPT 16TH 2024**

**RESPECFFULLY SUBMITTED THIS 12 DAY OF SEPT 2024 WHEREAS THE DEPAT MENT AND ALLOPPSING PARTIES WAS PROVIDED WITH A COPY OF THIS DOCUMENT VIA EMAIL ON 9/07/2022**

**2 "FRAUD ON THE COURTS" BY DISQGAULIFIED JUDGE KIRK VOLKER**

**3.VIOLATING THE FEDERAL REMOVAL STATUE**

**4.**

- <u>Yes, according to precedent set by the **11th Circuit Court** of Appeals, if parents can demonstrate substantial factual evidence that their minor child's 4th and 14th Amendment constitutional rights were violated during a state court dependency case, they can file a federal lawsuit to have the case heard in federal court,</u>

1

**Defendants Exhibit 4**

IN THE 15TH JUDICAL CIRCUIT COURT IN AND FOR PALM BECH COUNTY FLORIDA

**CASE# 50- 2019DP0000789/JL  AND CASE 50-2022DP0000587/JL**

**Randal A. Ferguson/ father**

**IN THE INTREST OF HI MINOT CHILDREN:**

**IN RE:**

**JOSHUA SMITH**

**KEVIN WALSH**

**JORGE ANTON**

                    **EMERGEMCY MOTION  TO COMPEL IMMEDIATELY**

**CC FILED TO ATTORNRY GENERAL**

**CC. NAACP**

**CC. TO FEDERAL DISTRICT COURT**

1. When a DCF attorney prevents a parent from making parenting decisions, this could be considered a violation of the parent's due process rights; essentially, denying them the right to participate in important decisions regarding their child without proper justification or a fair hearing.

2. According to available information, a significant 11th Circuit case where the court found DCF (Department of Children and Families) violated a parent's right to make decisions regarding their child, potentially impacting "parent-to-parent" contact, is "S.M. v. Florida

2

Department of Children & Families"; this case involved a situation where the court ruled that DCF had improperly interfered with parental decision-making during the child welfare proceedings, potentially impacting the ability of parents to communicate and collaborate with each other regarding their child's care.

The court focused on whether DCF had inappropriately restricted communication and decision-making between the parents during the dependency case, potentially violating their right to maintain a parent-to-parent relationship.

- **Decision:**

  The court found that DCF had overstepped its boundaries by hindering the parents' ability to make decisions about their child's welfare, thereby impacting their parent-to-parent contact.

**TO DCF ATTORNRY JOSHUA  SMITH . ( GAL) ATTORNRY KEVIN WALSJH   MIS- REPRESENTED  , UNLAWFULLY ATTORNRY OF MY CHILDREN  JORGE ANTON**

**FEDERAL PROTECTED  LAW RIGHTS OF THE RIGHTS OF  PARENTS**

- **IDEA.**   *IS THE FEDERAL SPECIAL EDUCATION  LAW. IT GIVES BIOLOGICAL AND ADOPTIVE PARENTS CERTAIN RIGHTS, STARTING WITH THE PARENTS RIGHT TO PARTICIPATE IN THEIR CHILD'S MEDICAL AND SPECIAL EDUCATION NEEDS UNDER FEDERAL LAW. THEY ARE PRESUMED TO BE THE PRIMARY DECISION MAKERS FOR THEIR CHILD. THAT'S TRUE EVEN IF THEIR CHILD IS IN FOSTER CARE. PARENTS HAVE THESE RIGHTS EVEN IF THEY LIVE IN ANOTHER STATE OR CAN'T TRAVEL TO THE SCHOOL*

**YOU ARE HERBY NOTIFIED:  YOU HAVE 24 HOURS TO PRODUCE THE FOLLOWING AND CONTACT MY DCF DCF DEGATE IONA GAMBLE  AT 561 273-3873 AND PROVIDE THE FOLLOWING TO ME AT rfergursonteach123@mailfence.com concerning all my children**

- **Update pictures of  all my children**

3

- Update of all medical and educational issue of my children
- Any up coming medical or educational issues
- The names of all daycare institution  aftercare and schools where my children are attending
- Stop immediately from  any and all decision concerning my children without first notifying me
- This also includes the foster parents and child net as well
- THE NAME OF THE SCHOLL AND CONTACT INFOR MATION WHERE MY SON RJ ATTENDS

-

SINCE JULY 9$^T$ 2023 TO DATE II WAS EXCLUDE FROM PARTICIPARING IN MY CHILDRENS BIRTHDAYS  THE HOIDAYS . I VEHEMETLEY DEMNAD REDRESS AS YOU HAVE STOLEN FORCE THEM TO ASISMILATE WHERE MY CHILDREN WHERE HEALTH AND DOING FINE.

MY CHILDREN ,WERE HAPPY AS YOU TRY TO CREATE AND PRESENT TO THE COURTS IN YOUR DEPRIVATIONS   MY CHILDREN ARE BETTER OFF . YOU HAVE CREATED EXTENDED TRAUMA EMOTIONAL PHYSICOLOGIGAL AND PHYSICAL  HARM THAT MY CHILDREN NEVER EXPERIENCE IN MY CUSTODY IN YOUR  INLUFIL SEIZER AND UNLAWFUL DETAINMENT OF MY CHILDREN.    YOU CHOSE TO PERSUE ENTOURAGE OF DELBERATE FALSEHOODS BY CPI BRIA ASKINS ACTING IN CONSPIRACY WITH NICOLE SLADE AND ANNIKA MCDONALD OF CHILD NET  THAT FAILED TO ESTABLISH PROBABLE CAUSE. WHERE EVEN DISQUALIFIED JUDGE KIRK VOLKER IN HSI EGRGIOUS JUDICAL MISCONDUCT COMMITTED A "FRAUD ON THE COURT" [PG 9 LINE 17 OF THE SAME POISEN SHELTER AFFIDAVIT OF DELBERATE FALSEHOODS.  AND YOU HASD YOU LEGA; AUTHORITY OR LEGAL STANDING TO UNLAWFULLY INTERFERE  INVADE AND INTRUDE UPON MY FEDERAL PROTECTED RIGHTS TO DEVELOP MY FAMILY  BECAUSE TOU MAKE A POOR DECSION

4

**while violating the rules of the code of professional of the florida**

**bar** TO PERSUE AS CASE WERE  AWARE THAT YOU WOULD NOT MEET THE BURDEN TO

ESTABLISH A PRIMA  FACIS CASE . AND DOING FIME MY CHILDREN  YOU HAVE DENIED

AND INTENTIONAQLLY EXLUDED ME FROM MY RIGHT TO PARENT  . I AM IN GREAT FEAR

AS TO THE WELFARE  HEALTH AND SAFTY OF MY CHILDREN I AM DEEPLY CONCERN OF

THE APPEARANCE  MY LONG AGO STATED CLEARLY OF OUR RELIGIOUS PRAXTICE

CONCERNING THEIR HAIR AND APPEARANCE THE EDUCATIONAL A ND MEDICAL

DEVELEOPMENT . WHERE  THIS COURT  WITH OUT  ANY LEGAL STANDING OR

JURISDICTION AS THEY HAVE UNLAWFULL SEIZED AND CONTINUE TO DENY ME ACESSS

OR VISTAION TO MY CHILDREN BASWD ON FRIVILOUS FILINGS AND JUDICAL

MISCONDUCT BY BOTH DISQUALIFIED JUDGE KIRK VOLKER AND KATHLEEN KROLL IN THIS

CASE PURSUANT TO CONTITUTIONAL DEPRIVATIONS OF FEDERALLY PROTECETED RIGHT

AS A PARENT AND MY CHILDRENS FEDERALLY PROTECTED RIGHTS, DCF STILL DOES NOT

HAVE ANY LEGAL STANDING TO EXCLUDE ME FROM MY RIGHT TO PARENT OR AS THE

PRIMARY DECISION MAKER OF MY CHILDREN. AS THEY UNLAWFULLY INTERFEERED INMY

•


*Fla R. Juv P 8.305 b (3) states " The issue of probable cause shall be determined in a non-*

*adversarial manner applying the standard of proof necessary for an arrest warrant".* **TO**

**LAWFULLY REMOVE THE MINOR CHILDREN, INVADING UPON THE THE DEFENDANT(S)**

**FAMILY WITHOUT LEGAL STANDING AND CONTRAY TO**

5

> **: .S Supreme Court Parental Rights:** *The Court has determined that parents have a fundamental right to direct the care, custody , and control of their children. This Court* <u>**also has page 63 determined that the government shall not interfere with this right unless and until a parent is proven unfit.**</u>
>
> <u>*Roberts v  U.S.  Jaycees. 468 U.S. 609.618- 620. 104 S. Ct.3244,82 L. Ed.2d 462 (1984)*  **child** *raising* *entitled to a substantial measure of sanctuary from unjustified interference by the state). Accordingly, parental rights are protected under The Federal Constitution   as both liberty*</u>

- **The Supreme Court** *has stated repeatedly  " When state actions  burden the Fundamental Rights of it's citizens,  a* **heightened degree** *of Judicial  Review is required*  **Roe v. Wade**. *410 U.S, 113. 155 (1973) The standard of review, sometimes called  " "***strict scrutiny***",   requires that for state action to be justified, the action the action must serve a  compelling state interest.* Yoder  **IT IS ALSO WELL SETTLED LAW:** Children are generally afforded the basic rights embodied by the Constitution. The Equal Protection Clause of the 14th Amendment is said to apply to children, but excludes those not yet born. There are both state and federal sources of children's-rights law.

 

**SINCE JULY 9TH TOU HAVE 2023 YOU HAVE DENIED AND INTENTIONAQLLY EXLUDED ME FROM MY RIGHT TO PARENT  . I AM IN GREAT FEAR AS TO THE WELFARE  HEALTH AND SAFTY OF MY CHILDREN I AM DEEPLY CONCERN OF THE APPEARANCE  MY LONG AGO STATED CLEARLY OF OUR RELIGIOUS PRAXTICE CONCERNING THEIR HAIR AND APPEARANCE THE EDUCATIONAL A ND MEDICAL DEVELEOPMENT . WHERE  THIS COURT  WITH OUT  ANY LEGAL STANDING OR JURISDICTION AS THEY HAVE UNLAWFULL SEIZED AND CONTINUE TO DENY ME**

6

ACESSS OR VISTAION TO MY CHILDREN BASWD ON FRIVILOUS FILINGS AND JUDICAL

MISCONDUCT BY BOTH DISQUALIFIED JUDGE KIRK VOLKER AND KATHLEEN KROLL IN THIS

CASE PURSUANT TO CONTITUTIONAL DEPRIVATIONS OF FEDERALLY PROTECETED RIGHT AS A

PARENT AND MY CHILDRENS FEDERALLY PROTECTED RIGHTS, DCF STILL DOES NOT HAVE ANY

LEGAL STANDING TO EXCLUDE ME FROM MY RIGHT TO PARENT OR AS THE PRIMARY

DECISION MAKER OF MY CHILDREN. AS THEY UNLAWFULLY INTERFEERED INMY



IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

JUVENILE DIVISION: J
CASE NO.: 2019DP00078

IN THE INTEREST OF:

RANDAL ANTON FERGUSON JR          DOB: 07/08/2018
RANDAL ANTONIQUE JAVONNE FERGUSON  DOB: 09/20/2019
AVAN AMORE FERGUSON               DOB: 12/28/2020
_____Minor Children___/

## ORDER ON PERMANENCY HEARING AND AMENDING CASE PLAN

THIS CAUSE came before the Court upon the Report and Recommendations of the General Magistrate after a **PERMANENCY HEARING** on the 1st day of June, 2023.

The Court, after reviewing said Report and the record herein and being otherwise advised in the premises, finds that this Court has jurisdiction over the parties and the subject matter of this proceeding.

The Court further finds that the findings set forth in the Report and Recommendation of the General Magistrate are sufficient to form the basis for the Order of this Court. The General Magistrate's findings are hereby confirmed and the relief recommended by the General Magistrate is hereby adopted and ratified as an Order of this Court.

**The case plan is amended to extend the goal date to 9/21/23, without prejudice to any party to seek termination of supervision and jurisdiction at any time.**

The Court orders that the General Magistrate is hereby authorized to conduct such further examinations and hold such hearings as deemed necessary in this cause.

**DONE AND ORDERED** in Palm Beach County, Florida on the 6th day of July, 2023.

502019DP000789XXXXMB    07/06/2023
Kirk C. Volker   Circuit Judge

502019DP000789XXXXMB    07/06/2023
Kirk C. Volker
Circuit Judge

FILED: PALM BEACH COUNTY, FL, JOSEPH ABRUZZO, CLERK, 07/06/2023 04:26:36 PM

Exhibit #6 Hospital

**Good Samaritan Medical Center**
1309 N. Flagler Drive
West Palm Beach, FL 33401-3406

| | | | |
|---|---|---|---|
| Patient: | FERGUSON, RANDAL A | Attending Provider: | JOY MD,JESTIN |
| MRN #: | 437869 | Admission Date: | 12/16/2024 |
| Account #: | 81761744 | Discharge Date: | |
| DOB/Age/Sex: | 8/30/1968  / 56 years  / Male | Lab Medical Director(s): | Thomas Bolton, MD |

---

*Discharge Documentation/Instructions*

Document type:           IP Patient Depart Summary
Document Subject:       Inpatient Discharge Instructions
Document Date/Time:     12/17/2024 12:43 EST
Document Status:         Auth (Verified)
Performed By:            Allison Jr.RN,James (12/17/2024 12:44 EST)
Authenticated By:        Allison Jr.RN,James (12/17/2024 12:44 EST)

# FERGUSON, RANDAL A

**DOB:** 08/30/1968
**MRN:** 437869
**Phone Number:** 5616677870
**Address:** 1673 W 28TH ST RIVIERA BEACH FL 33404-4018

**FIN:** 81761744
**Weight kg:**
**Document Created:** 12/17/2024 12:43:53

# Patient Discharge Instructions

**Good Samaritan Medical Center would like to thank you for allowing us to assist you with your healthcare needs. The following includes patient education materials and information regarding your injury/illness.**

## Patient Portal

Your test results and important health information are available online on My Health Rec. If you did not sign up for My Health Rec during your visit, please go to the hospital website to enroll. The first step is to create a My Health Rec account. Once you create an account, you will be able to use other online applications to manage your health information. When you use an online application, it will sign in to your secure My Health Rec account. Call 1-888-252-8149 if you need help with My Health Rec. If you have questions about medicines or health concerns after going home from the hospital, please call your doctor's office.

## Discharge Orders

| Order Name | Order Details |
|---|---|
| Discharge Patient | Discharge To: Home |
| | Discharge Diet: Resume Home Diet |
| | Discharge Activity: Resume Home Activity |
| | Comment: Patient can be discharged after seen with attending today |

---

Report Request ID:    625441191          Page 1 of 13          Printed:    12/17/2024
                                                                     12:46 EST

**Good Samaritan Medical Center**
1309 N. Flagler Drive
West Palm Beach, FL 33401-3406

| | | | |
|---|---|---|---|
| **Patient:** | FERGUSON, RANDAL A | **Attending Provider:** | JOY MD,JESTIN |
| **MRN #:** | 437869 | **Admission Date:** | 12/16/2024 |
| **Account #:** | 81761744 | **Discharge Date:** | |
| **DOB/Age/Sex:** | 8/30/1968  / 56 years  / Male | **Lab Medical Director(s):** | Thomas Bolton, MD |

---

### *Discharge Documentation/Instructions*

## Primary Care Provider
**Name:** UNKNOWN MD, PCP (GSM)

**Phone:**

---

## Advance Directives
Advance Directive -
  No
Advance Directive Additional Information -
  Information refused

---

## Reason for Your Visit

chest pain since last night 324 of asprin given en route

---

## Your Diagnosis

Chest pain
Musculoskeletal chest pain
Abnormal EKG
Sciatica of right side
Obesity
Acute pain
Chest pain
Neuropathy

---

# What to do next

## You Need to Schedule the Following Appointments

**Follow Up with** Follow up with
primary care provider
**When** Within 5 to 7 days

---

| | | | |
|---|---|---|---|
| Report Request ID:   625441191 | Page 2 of 13 | Printed: | 12/17/2024 12:46 EST |

**Good Samaritan Medical Center**
1309 N. Flagler Drive
West Palm Beach, FL 33401-3406

| | | | |
|---|---|---|---|
| **Patient:** | FERGUSON, RANDAL A | **Attending Provider:** | JOY MD,JESTIN |
| **MRN #:** | 437869 | **Admission Date:** | 12/16/2024 |
| **Account #:** | 81761744 | **Discharge Date:** | |
| **DOB/Age/Sex:** | 8/30/1968  / 56 years    / Male | **Lab Medical Director(s):** | Thomas Bolton, MD |

## *Discharge Documentation/Instructions*

**Follow Up with** JUSINO MD, EDUARDO
**When** Within 5 to 7 days

**Why:** Call for follow up appointment
**Where:** 1397 MEDICAL PARK BLVD #340
WELLINGTON, FL 33414-
5615686463

**Good Samaritan Medical Center**
1309 N. Flagler Drive
West Palm Beach, FL 33401-3406

| | | | |
|---|---|---|---|
| **Patient:** | FERGUSON, RANDAL A | **Attending Provider:** | JOY MD,JESTIN |
| **MRN #:** | 437869 | **Admission Date:** | 12/16/2024 |
| **Account #:** | 81761744 | **Discharge Date:** | |
| **DOB/Age/Sex:** | 8/30/1968  / 56 years   / Male | **Lab Medical Director(s):** | Thomas Bolton, MD |

---

*Discharge Documentation/Instructions*

# Medication Instructions

**Your discharge prescriptions may be printed, called in, or transmitted electronically to the pharmacy. If there are any issues with your prescriptions, please call the physician.**

| | What | How Much | When | Why | Instructions | Next Dose |
|---|---|---|---|---|---|---|
| New | acetaminophen-oxycodone (acetaminophen-oxyCODONE 325 mg-5 mg oral tablet) | 1 tablet(s) Oral | Every 6 hours scheduled as needed for Pain Moderate | Acute pain | Duration: 3 day(s) Pickup at Walgreens Specialty Pharmacy #13981 @ at Waterview Tower | |
| New | famotidine (famotidine 20 mg oral tablet) | 1 tablet(s) Oral | Twice daily | | Duration: 10 day(s) Pickup at Walgreens Specialty Pharmacy #13981 @ at Waterview Tower | |
| New | gabapentin (gabapentin 300 mg oral capsule) | 1 capsule(s) Oral | Three times a day | Neuropathy | Duration: 30 day(s) Pickup at Walgreens Specialty Pharmacy #13981 @ at Waterview Tower | |
| New | lidocaine topical (lidocaine 4% topical film) | 1 patch(es) TransDermal | Daily | | Duration: 10 day(s) Pickup at Walgreens Specialty Pharmacy #13981 @ at Waterview Tower | |
| New | meloxicam (meloxicam 15 mg oral tablet) | 1 tablet(s) Oral | Daily | | Duration: 10 day(s) Pickup at Walgreens Specialty Pharmacy | |

**Good Samaritan Medical Center**
1309 N. Flagler Drive
West Palm Beach, FL 33401-3406

| | | | |
|---|---|---|---|
| **Patient:** | FERGUSON, RANDAL A | **Attending Provider:** | JOY MD,JESTIN |
| **MRN #:** | 437869 | **Admission Date:** | 12/16/2024 |
| **Account #:** | 81761744 | **Discharge Date:** | |
| **DOB/Age/Sex:** | 8/30/1968  / 56 years  / Male | **Lab Medical Director(s):** | Thomas Bolton, MD |

## Discharge Documentation/Instructions

| | What | How Much | When | Why | Instructions | Next Dose |
|---|---|---|---|---|---|---|
| | | | | | #13981 @ at Waterview Tower | |
| New | predniSONE (predniSONE 20 mg oral tablet) | 2 tablet(s) Oral | Daily with a meal | | Duration: 5 day(s) Pickup at Walgreens Specialty Pharmacy #13981 @ at Waterview Tower | |
| New | tizanidine (tiZANidine 2 mg oral tablet) | 1 tablet(s) Oral | Daily as needed for Muscle Spasm | | Duration: 7 day(s) Pickup at Walgreens Specialty Pharmacy #13981 @ at Waterview Tower | |

**Pharmacy Information**
Walgreens Specialty Pharmacy #13981 @ at Waterview Tower: 1515 N Flagler Dr Ste 120 West Palm Beach, FL 334013429 (561) 366 - 1393

# This Is Your New Current Medications List as of 12/17/2024 12:43:53

We have provided a list of your active medications as a courtesy so that you can easily update your home records and provide to your physician(s). These are the only medications that you should be taking. Do not stop taking these medications until told to stop. Please review carefully and contact your doctor prior to taking any medications NOT on this list.

- acetaminophen-oxycodone (acetaminophen-oxyCODONE 325 mg-5 mg oral tablet)
- famotidine (famotidine 20 mg oral tablet)
- gabapentin (gabapentin 300 mg oral capsule)
- lidocaine topical (lidocaine 4% topical film)
- meloxicam (meloxicam 15 mg oral tablet)
- predniSONE (predniSONE 20 mg oral tablet)
- tizanidine (tiZANidine 2 mg oral tablet)

**Good Samaritan Medical Center**
1309 N. Flagler Drive
West Palm Beach, FL 33401-3406

| | | | |
|---|---|---|---|
| **Patient:** | FERGUSON, RANDAL A | **Attending Provider:** | JOY MD,JESTIN |
| **MRN #:** | 437869 | **Admission Date:** | 12/16/2024 |
| **Account #:** | 81761744 | **Discharge Date:** | |
| **DOB/Age/Sex:** | 8/30/1968  / 56 years    / Male | **Lab Medical Director(s):** | Thomas Bolton, MD |

---

*Discharge Documentation/Instructions*

# Allergies

No Known Medication Allergies; NKA

# Studies and Tests Performed

**Below is a partial list of the tests performed during your hospitalization. You may have had other tests and procedures not included on this list. All tests and labs ordered have been completed or are listed below as 'Results Pending'. Please discuss all results with your provider listed above in these instructions.**

Basic Metabolic Panel

Complete Blood Count With Auto Differential

Comprehensive Metabolic Panel

Lipid Panel

Magnesium Level

Pro-BNP

Troponin T

Uric Acid

XR Chest 1 View

# Education Materials

## Arthritis

Arthritis means joint pain. It can also mean joint disease. A joint is a place where bones come together. There are more than 100 types of arthritis.

## What are the causes?

This condition may be caused by:

- Wear and tear of a joint. This is the most common cause.
- A lot of acid in the blood, which leads to pain in the joint (gout).
- Pain and swelling (inflammation) in a joint.
- Infection of a joint.

**Good Samaritan Medical Center**
1309 N. Flagler Drive
West Palm Beach, FL 33401-3406

| | | | |
|---|---|---|---|
| **Patient:** | FERGUSON, RANDAL A | **Attending Provider:** | JOY MD,JESTIN |
| **MRN #:** | 437869 | **Admission Date:** | 12/16/2024 |
| **Account #:** | 81761744 | **Discharge Date:** | |
| **DOB/Age/Sex:** | 8/30/1968  / 56 years  / Male | **Lab Medical Director(s):** | Thomas Bolton, MD |

---

### Discharge Documentation/Instructions

- Injuries in the joint.
- A reaction to medicines (allergy).

In some cases, the cause may not be known.

# What are the signs or symptoms?

Symptoms of this condition include:

- Redness at a joint.
- Swelling at a joint.
- Stiffness at a joint.
- Warmth coming from the joint.
- A fever.
- A feeling of being sick.

# How is this treated?

This condition may be treated with:

- Treating the cause, if it is known.
- Rest.
- Raising (elevating) the joint.
- Putting cold or hot packs on the joint.
- Medicines to treat symptoms and reduce pain and swelling.
- Shots of medicines (cortisone) into the joint.

You may also be told to make changes in your life, such as doing exercises and losing weight.

# Follow these instructions at home:

**Medicines**

- Take over-the-counter and prescription medicines only as told by your doctor.
- **Do not** take aspirin for pain if your doctor says that you may have gout.

**Activity**

- Rest your joint if your doctor tells you to.
- Avoid activities that make the pain worse.
- Exercise your joint regularly as told by your doctor. Try doing exercises like:
  - Swimming.
  - Water aerobics.
  - Biking.
  - Walking.

**Managing pain, stiffness, and swelling**

**Good Samaritan Medical Center**
1309 N. Flagler Drive
West Palm Beach, FL 33401-3406

| | | | |
|---|---|---|---|
| **Patient:** | FERGUSON, RANDAL A | **Attending Provider:** | JOY MD,JESTIN |
| **MRN #:** | 437869 | **Admission Date:** | 12/16/2024 |
| **Account #:** | 81761744 | **Discharge Date:** | |
| **DOB/Age/Sex:** | 8/30/1968  / 56 years  / Male | **Lab Medical Director(s):** | Thomas Bolton, MD |

---

## Discharge Documentation/Instructions





- If told, put ice on the affected area.
  - Put ice in a plastic bag.
  - Place a towel between your skin and the bag.
  - Leave the ice on for 20 minutes, 2–3 times per day.
- If your joint is swollen, raise (elevate) it above the level of your heart if told by your doctor.
- If your joint feels stiff in the morning, try taking a warm shower.
- If told, put heat on the affected area. Do this as often as told by your doctor. Use the heat source that your doctor recommends, such as a moist heat pack or a heating pad. If you have diabetes, **do not** apply heat without asking your doctor. To apply heat:
  - Place a towel between your skin and the heat source.
  - Leave the heat on for 20–30 minutes.
  - Remove the heat if your skin turns bright red. This is very important if you are unable to feel pain, heat, or cold. You may have a greater risk of getting burned.

### General instructions

- **Do not** use any products that contain nicotine or tobacco, such as cigarettes, e-cigarettes, and chewing tobacco. If you need help quitting, ask your doctor.
- Keep all follow-up visits as told by your doctor. This is important.

# Contact a doctor if:

- The pain gets worse.
- You have a fever.

# Get help right away if:

- You have very bad pain in your joint.
- You have swelling in your joint.

**Good Samaritan Medical Center**
1309 N. Flagler Drive
West Palm Beach, FL 33401-3406

| | | | |
|---|---|---|---|
| **Patient:** | FERGUSON, RANDAL A | **Attending Provider:** | JOY MD,JESTIN |
| **MRN #:** | 437869 | **Admission Date:** | 12/16/2024 |
| **Account #:** | 81761744 | **Discharge Date:** | |
| **DOB/Age/Sex:** | 8/30/1968  / 56 years    / Male | **Lab Medical Director(s):** | Thomas Bolton, MD |

---

### Discharge Documentation/Instructions

- Your joint is red.
- Many joints become painful and swollen.
- You have very bad back pain.
- Your leg is very weak.
- You cannot control your pee (urine) or poop (stool).

## Summary

- Arthritis means joint pain. It can also mean joint disease. A joint is a place where bones come together.
- The most common cause of this condition is wear and tear of a joint.
- Symptoms of this condition include redness, swelling, or stiffness of the joint.
- This condition is treated with rest, raising the joint, medicines, and putting cold or hot packs on the joint.
- Follow your doctor's instructions about medicines, activity, exercises, and other home care treatments.

This information is not intended to replace advice given to you by your health care provider. Make sure you discuss any questions you have with your health care provider.

Document Revised: 11/25/2019 Document Reviewed: 11/25/2019 Elsevier Patient Education © 2022 Elsevier Inc.

## Excuse from Work, School, or Physical Activity

__Randal Ferguson_____ needs to be excused from:

_____ Work.

_____ School.

___x_ Physical activity.

This is effective for the following dates: __12/17/24-12/20/24_____.

He or she may return to work or school, but should avoid physical activity or other activities from now until __12/21/24_____.

Activity restrictions include:

_____ Lifting more than _____ lb.

_____ Sitting longer than _____ minutes at a time.

_____ Standing longer than _____ minutes at a time.

__x__ Other activities including: _____strenuous
activity_____

__x__ He or she may return to full physical activity on _____12/21/24_____.

Health care provider name (printed): _Dr. Jestin Joy MD _____

Health care provider (signature): __Dr. Jestin Joy MD _____

Date: _____12/17/24_____

**Good Samaritan Medical Center**
1309 N. Flagler Drive
West Palm Beach, FL 33401-3406

| | | | |
|---|---|---|---|
| **Patient:** | FERGUSON, RANDAL A | **Attending Provider:** | JOY MD,JESTIN |
| **MRN #:** | 437869 | **Admission Date:** | 12/16/2024 |
| **Account #:** | 81761744 | **Discharge Date:** | |
| **DOB/Age/Sex:** | 8/30/1968  / 56 years  / Male | **Lab Medical Director(s):** | Thomas Bolton, MD |

---

### *Discharge Documentation/Instructions*

---

This information is not intended to replace advice given to you by your health care provider. Make sure you discuss any questions you have with your health care provider.

Document Revised: 06/09/2022 Document Reviewed: 12/08/2021 Elsevier Patient Education © 2022 Elsevier Inc.

## Chest Wall Pain

Chest wall pain is pain in or around the bones and muscles of your chest. Sometimes, an injury causes this pain. Excessive coughing or overuse of arm and chest muscles may also cause chest wall pain. Sometimes, the cause may not be known. This pain may take several weeks or longer to get better.

# Follow these instructions at home:

### Managing pain, stiffness, and swelling



- If directed, put ice on the painful area:
  - Put ice in a plastic bag.
  - Place a towel between your skin and the bag.
  - Leave the ice on for 20 minutes, 2–3 times per day.

### Activity

- Rest as told by your health care provider.
- Avoid activities that cause pain. These include any activities that use your chest muscles or your abdominal and side muscles to lift heavy items. Ask your health care provider what activities are safe for you.

### General instructions



- Take over-the-counter and prescription medicines only as told by your health care provider.

**Good Samaritan Medical Center**
1309 N. Flagler Drive
West Palm Beach, FL 33401-3406

| | | | |
|---|---|---|---|
| Patient: | FERGUSON, RANDAL A | Attending Provider: | JOY MD,JESTIN |
| MRN #: | 437869 | Admission Date: | 12/16/2024 |
| Account #: | 81761744 | Discharge Date: | |
| DOB/Age/Sex: | 8/30/1968  / 56 years  / Male | Lab Medical Director(s): | Thomas Bolton, MD |

---

## Discharge Documentation/Instructions

- **Do not** use any products that contain nicotine or tobacco, such as cigarettes, e-cigarettes, and chewing tobacco. These can delay healing after injury. If you need help quitting, ask your health care provider.
- Keep all follow-up visits as told by your health care provider. This is important.

## Contact a health care provider if:

- You have a fever.
- Your chest pain becomes worse.
- You have new symptoms.

## Get help right away if:

- You have nausea or vomiting.
- You feel sweaty or light-headed.
- You have a cough with mucus from your lungs (sputum) or you cough up blood.
- You develop shortness of breath.

**These symptoms may represent a serious problem that is an emergency. Do not wait to see if the symptoms will go away. Get medical help right away. Call your local emergency services (911 in the U.S.). Do not drive yourself to the hospital.**

## Summary

- Chest wall pain is pain in or around the bones and muscles of your chest.
- Depending on the cause, it may be treated with ice, rest, medicines, and avoiding activities that cause pain.
- Contact a health care provider if you have a fever, worsening chest pain, or new symptoms.
- Get help right away if you feel light-headed or you develop shortness of breath. These symptoms may be an emergency.

This information is not intended to replace advice given to you by your health care provider. Make sure you discuss any questions you have with your health care provider.

Document Revised: 03/04/2022 Document Reviewed: 03/04/2022 Elsevier Patient Education © 2022 Elsevier Inc.

# Common Emergency Awareness Tips

If you have a problem and are not able to contact your primary care provider, please return to the hospital's Emergency Department at any time.

| IS IT A STROKE? | **BE-FAST** and Check for these Signs: |
|---|---|
| **B**ALANCE | Did they suddenly lose balance? |
| **E**YES | Do they have any new vision loss? |
| **F**ACE | Does the face look uneven? |

**Good Samaritan Medical Center**
1309 N. Flagler Drive
West Palm Beach, FL 33401-3406

| | | | |
|---|---|---|---|
| **Patient:** | FERGUSON, RANDAL A | **Attending Provider:** | JOY MD,JESTIN |
| **MRN #:** | 437869 | **Admission Date:** | 12/16/2024 |
| **Account #:** | 81761744 | **Discharge Date:** | |
| **DOB/Age/Sex:** | 8/30/1968  / 56 years    / Male | **Lab Medical Director(s):** | Thomas Bolton, MD |

---

### Discharge Documentation/Instructions

| | |
|---|---|
| ARM | Does one arm drift down? |
| SPEECH | Does their speech sound strange? |
| TIME | Call 9-1-1 at any sign of stroke |

# Heart Attack Signs

**Chest discomfort:** Most heart attacks involve discomfort in the center of the chest and lasts more than a few minutes, or goes away and comes back. It can feel like uncomfortable pressure, squeezing, fullness or pain.
**Discomfort in upper body:** Symptoms can include pain or discomfort in one or both arms, back, neck, jaw or stomach.
**Shortness of breath:** With or without discomfort.
**Other signs:** Breaking out in a cold sweat, nausea, or lightheaded.
Remember, **MINUTES DO MATTER.** If you experience any of these heart attack warning signs, call **9-1-1** to get immediate medical attention!

# Suicide Awareness

If you are having thoughts of harming yourself or others, call 911 or go to the nearest emergency department. You may also contact the National Suicide Prevention Lifeline at 988 or 800-273-TALK (8255).

**Exhibit 7** 8:44

IN THE CIRCUIT COURT, JUVENILE DIVISION
Randal Antonique

**Exhibit #D**

EH
Name: LAVENDER, FERGUSON/RANDAL JR/EVAN/AVAN   Case #: 19-DP-799AJQ
Date: 10/2/2024   Judge: Kroll   Clerk: PS
Event: PCA - PC ADVISORY HEARING   1 mot for counsel

PRESENT: (✓) CLS ( ) CINS/FINS ATTY (✓) CASEWORKER (✓) GAL (✓) GAL ATTY (✓) JAdP ATTY
Smith    Swindler    Werner    Walsh    FCP Anton

(✓) ATTY-MOM Fenner (zoom)   ( ) ATTY-DAD _____   ( ) Mother (✓) Father
(✓) ATTY-DAD Pro Se
( ) Child ( ) Interpreter   ( ) Other: _____
( ) Appt. Atty-Mother   ( ) Appt. Atty-Father
(✓) Appt. Atty-Father Carrigan Karabedian   ( ) Atty Waived for _____

ARRAIGNMENT/SHELTER:
( ) P/C Found ( ) No P/C Found ( ) GAL Appt / Discharge ( ) Mom / Dad / Child Sworn
( ) FCP / JAdP Appt / Dis ( ) Charges Read ( ) Mother / Father Failed To Appear
(✓) Father Admit (Deny) / Consent ( ) Mother Admit / Deny / Consent
( ) Mother / Father Incarcerated ( ) Voluntary Surrender - Mom / Dad
INFORMATION ORDERED ( ) Mediation ( ) Psychological Evaluation on _____
Order To Show Cause On _____   ( ) Case Dismissed - Mom / Dad
( ) Order to take into Custody ( ) Cancel Order to take into Custody ( ) PDS Recomm. Approved
( ) Transfer Supervision / Jurisdiction / Disposition to: _____
(✓) Parent(s) admonished regarding failure to appear   ( ) Parent(s) advised of private Adoption
CINS/FINS: ( ) Adjudication ( ) W-Held Adjudication ( ) DJJ To Prepare Order

FILED
In Open Court
OCT 02 2024
Unified Family Court
Juvenile Division

JR
11/1/24
@ 200

ORDERED:   MOTHER / FATHER
MOTHER / FATHER   ( )   ( )   W-Held Adjudication
( )   ( )   Adjudication   ( )   ( )   Shall appear at next hearing
( )   ( )   Case Plan Approved   ( )   ( )   Term. Parental Rights
( - )   ( )   Home Study
Def./State Motion to _____   Granted / Denied / Reserved / W-Drawn

D/L Search Mom
DCA in process

NOTICE FOR NEXT COURT EVENT _____   (✓) Trial/Mom/Dad   CFT

( ) Arr/Mom/Dad ( ) Cal Call/Mom/Dad RE: _____
( ) Case Plan Approval/Mom/Dad ( ) Disposition/Mom/Dad ( ) Jud. Review On PCA mom / Pretrial
( ) Status Check on _____   ( ) Motion _____
CFT SET ON 12-16, 17, 18, 20-24 AT 900 AM/PM RM. Sr Judge 4days
Pretrial SET ON 11-13-24 AT 1130 AM/PM RM. 3A
PCA mom 3A (Main Branch) MB, 205 N. Dixie Highway West Palm Beach FL 33401
PARENT/GUARDIAN _____   Atty _____

**DEPENDENCY** Failure to personally appear at the arraignment hearing or dependency trial constitutes consent to the adjudication of this child(ren) as to dependent child(ren) and may ultimately result in loss of custody of this child(ren)

**TERMINATION** Failure to personally appear at the advisory hearing or termination of parental rights trial constitutes consent to termination of parental rights of the child(ren). If you fail to personally appear on the date and time specified, you may lose all legal rights as a parent to the child(ren).

Defendant(s) Father Behit #10